Filed 8/2/12

# IN THE SUPREME COURT OF CALIFORNIA

THE PEOPLE,      )
     )
       Plaintiff and Respondent,      )
     )          S035190
       v.      )
     )
ERIC CHRISTOPHER HOUSTON,      )
     )          Napa County
       Defendant and Appellant.      )     Super. Ct. No. CR 14311
_____ )

A jury convicted defendant Eric Christopher Houston of the first degree murders of Robert Brens, Judy Davis, Beamon Hill, and Jason White (Pen. Code, §§ 187, subd. (a), 189; further undesignated statutory references are to the Penal Code), and found true a multiple-murder special-circumstance allegation (§ 190.2, subd. (a)(3)). The jury also convicted defendant of the attempted murders of Wayne Boggess, Patricia Collazo, Danita Gipson, Donald Graham, Thomas Hinojosai, John Kaze, Sergio Martinez, Jose Rodriguez, Rachel Scarberry, and Mireya Yanez (§§ 187, subd. (a), 664); and found true allegations that the attempted murders were willful, deliberate, and premeditated (§ 664); that defendant personally used a firearm in committing the murders and attempted murders (§ 12022.5); and that, except as to Graham, defendant personally inflicted great bodily injury in committing the attempted murders (§ 12022.7). The jury further convicted defendant of assault with a firearm on Joshua Hendrickson, Bee Moua, and Tracy Young (§ 245, subd. (a)(2)), and false imprisonment for the purpose of protection from arrest (§ 210.5). After a sanity trial, the jury found defendant to be sane; after a

1

penalty phase, the jury returned a verdict of death. The trial court denied defendant's motion to dismiss the special circumstance finding and the automatic motion to modify the penalty verdict (§ 190.4, subd. (e)), and sentenced him to death on the murder counts, life imprisonment on the attempted murder counts, and a determinate sentence on the remaining counts and enhancements.

Appeal to this court is automatic. (§ 1239, subd. (b).) We affirm the judgment.

## I.

### A. Guilt Phase

On May 1, 1992, while armed with a shotgun and a rifle, defendant entered the high school he had last attended in 1989, shot and killed four people, and wounded several others. Defendant then held approximately 80 to 90 students hostage for about eight hours before surrendering. Defendant attacked the school because one of his former teachers had given him a failing grade, which, according to defendant, caused him to not graduate and to lose his job, and also caused his girlfriend to leave him. At trial, defendant also accused this former teacher of having molested him.

#### 1. Prosecution Evidence

In early 1992, defendant on several occasions told his best friend, David Rewerts, that he would like to go to Lindhurst High School and shoot a couple of people. Defendant read to Rewerts passages from a book on military tactics and police procedures. Defendant owned a shotgun, two .22-caliber semiautomatic rifles, and another firearm. Rewerts had gone target shooting with defendant. According to Rewerts, defendant could cock his pump-action shotgun with one arm.

Defendant lived with his mother and older half brother. On the morning of May 1, 1992, defendant waited outside his home for the mail carrier to deliver his unemployment check and left after the check arrived. Between 11 a.m. and 1 p.m., defendant went to three different stores looking for a specific type of shotgun ammunition, and he

2

ultimately purchased No. 4 buckshot ammunition for a shotgun, .22-caliber ammunition, and an ammunition pouch. A clerk testified that defendant had a shopping list with him.

Although the precise sequence of the day's events is somewhat unclear, about 1:50 p.m., a teacher at Lindhurst High School saw someone, later identified as defendant, walking "with a determined stride" toward building C. Defendant wore a camouflage vest with pockets full of shotgun shells, two bandoliers full of ammunition, and a full ammunition belt. He carried a 12-gauge shotgun, had slung over his back a .22-caliber rifle with the butt sawed off, and wore a canteen on his belt. The teacher asked defendant if he had a permit for the shotgun he was carrying. He looked at her, did not respond, and continued walking toward the building.

Defendant entered building C, walked into classroom C-108, pointed his shotgun at Rachel Scarberry, a student, and shot her in the chest. Defendant then shot Robert Brens, a teacher, who ultimately died of chest wounds. Defendant walked towards Brens's fallen body, turned around, and shot student Judy Davis in the face and upper chest, killing her. Defendant then shot at Thomas Hinojosai, a student, as he dove away; the blast hit him in the ear and the shoulder. Tracy Young, a student, dove to the floor after defendant's first shot, but was hit in the foot by one of the shots.

Defendant left the classroom, continued down the hallway, and fired three times into classroom C-105, injuring three students: Jose Rodriguez was struck in the feet; Patricia Collazo was struck in the right knee; and Mireya Yanez was struck in the knees. Defendant then went to the doorway of classroom C-107 and shot and killed Jason White, a student. Defendant at some point passed by classroom C-109, saw student Sergio Martinez hiding in the corner, and shot at him. Martinez attempted to move away but was hit in the left arm.

At some point during the shootings, Joshua Hendrickson, a student in classroom C-204 on the second floor, heard the shots, left the classroom, looked over the railing,

3

and saw defendant on the first floor. Defendant saw Hendrickson and shot at him. Hendrickson retreated into the classroom.

Around this time, Danita Gipson, a student in classroom C-110, heard the shots and left the classroom to investigate. John Kaze, a substitute teacher, followed her. Gipson walked down the hallway and saw defendant. Defendant saw Gipson and aimed at her. She attempted to run away but was shot in the buttocks. Gipson fell to the ground, got up, and then ran back to classroom C-110. Defendant walked toward Kaze with "a slight smile on his face and a spring to his step." Kaze attempted to return to classroom C-110, but before he could do so, defendant shot him in the face, shoulder, and neck. Kaze retreated into the classroom. Wayne Boggess, a student in classroom C-110, started to leave the classroom but failed to respond to a cry for everyone to get down and instead stood in the doorway as if "in a daze." Defendant shot Boggess in the face. Defendant then walked toward classroom C-102.

The teacher in classroom C-102 heard the shots, went to the hallway, and yelled to Donald Graham, the teacher in classroom C-101, "911. Man with a gun. Shots fired." Graham leaned out the doorway and asked the other teacher to repeat himself. Defendant shot at Graham and hit him in the forearm, and Graham retreated into classroom C-101. Defendant reloaded, went to classroom C-102, and made eye contact with a female student inside. Beamon Hill, another student in the classroom, yelled, "No," and pushed her to the floor. Defendant shot Hill in the head, killing him, and walked away.

At some point during the shootings, Bee Moua, a student in classroom C-104, tried to leave the room. As Moua was getting up from his desk, defendant fired two shots into the classroom from the hallway. Moua and the other students in the room dropped to the floor and stayed there.

Defendant headed up a stairway, entered classroom C-204, told the teacher to leave, and ordered the approximately 24 students to get to one side of the room. Defendant ordered the students to barricade the doorway with a bookshelf. At defendant's

4

command, a student went to classroom C-104 and told the students in that room to join the others in classroom C-204, promising that if they did, defendant would not shoot them. They complied. Students hiding in the library and other classrooms were similarly ordered to classroom C-204. The teachers were ordered to leave the building. Eventually there were 80 to 90 students in classroom C-204. Defendant assigned four to six students to different positions in the building to act as lookouts.

Using the school's intercom system, defendant contacted law enforcement personnel and threatened to shoot people if the school bells were not turned off. Defendant told law enforcement personnel that Brens had flunked him and that he had been fired from his job because he did not have a high school diploma. Defendant made similar statements to the students in the room, saying Brens had "ruined his life" and he was going to make Brens "pay." Defendant also said his girlfriend had left him. Defendant blamed Brens and the school system, and wanted to "make a point" and ensure that other teachers did not repeat this mistake.

Defendant told the students he had previously reconnoitered the school. Defendant also said he had placed gasoline around the building and would ignite it if his plan did not work. Defendant told the students that he had studied police tactics as well as the Penal Code, so he was aware of the potential sentence he faced.

Defendant sent a student to retrieve a radio. Defendant appeared relieved when the radio newscast announced no one had been killed, but he appeared surprised when it reported that he had shot people. Defendant later admitted that he had shot Brens "in the ass," and then smiled. Defendant told the students he had not intended to kill anyone.

Defendant asked the students if they had to use the restroom, and many responded that they did. Defendant allowed the students to go downstairs to the restroom in pairs, threatening to kill everyone in the classroom if they did not return. The second pair of students sent to the restroom did not return. A third student was sent to look for the pair, but he did not return either.

Later in the afternoon, law enforcement personnel delivered to classroom C-204 a portable telephone system, which permitted them to monitor and record the sounds in the classroom even when the device was not in use. Law enforcement personnel recorded the hostage situation, and the jury later listened to the audiotapes.

At some point, defendant demanded that law enforcement personnel deliver a key to the faculty restroom, which could be seen from the classroom, and threatened to kill people if it was not delivered in a timely manner. Defendant later fired a warning shot, shattering a library window. After law enforcement personnel delivered the key, defendant allowed the students to go to the faculty restroom in pairs, again threatening to kill everyone in the classroom if they did not return. Two pairs of students who left to use the restroom did not return.

Hendrickson told defendant that he was not feeling well and was allowed to leave. Defendant also released a student who was crying hysterically and another who claimed to be pregnant. A short while later, defendant released 10 to 15 more hostages as a sign of good faith. At law enforcement personnel's request, the remaining students wrote their names and telephone numbers on a piece of paper so that their parents could be informed. As the students became hungry, defendant released 15 to 30 hostages in exchange for pizza, soda, and some ibuprofen for the students complaining of headaches.

Defendant asked law enforcement personnel about the condition of the people he had shot. They lied and said no one had been killed. Defendant inquired whether he could receive a light sentence and sought assurances that they would not "double-cross him." At defendant's insistence, law enforcement personnel sent him a purported contract guaranteeing that he would serve no more than five years in a minimum security facility that had education and employment opportunities. Representatives of the Yuba City Police Department and Yuba County Sheriff's Department had signed the document. Sixteen of the hostages also signed the document as witnesses.

6

Defendant eventually released the remaining students, with the final group leaving at about 10 p.m. Defendant then left his weapons, ammunition, and a pair of thumb cuffs in the classroom, left the building, and was taken into custody.

At some point during the hostage situation, law enforcement personnel obtained consent from defendant's mother to search defendant's bedroom in her house and recovered a handwritten supply list, which included quantities of ammunition, lighter fluid, and a rifle sling. They also recovered empty ammunition boxes, including boxes for No. 4 buckshot for a shotgun and a handwritten note addressed "to my family," which read in part, "I know parenting had nothing to do with what [happens] today. It [seems] my sanity has slipped away and evil [took its] place. The mistakes the loneliness and the failure have built up [too] high. Also I just want to say I love my family very very much." Officers, pursuant to a search warrant, later recovered additional papers, including one captioned "Mission Profile" consisting of a hand-drawn diagram of building C. Officers recovered pieces of a torn-up sheet of paper, on which had been handwritten in part, "What I did today at the school . . . . [¶] [I've] been [fascinated] with weapons and death . . . . [S]et on killing. [¶] My [hatred toward] humanity forced me . . . what I did." Officers also found two magazines that focused on law enforcement weapons and tactics and a copy of an abridged version of the Penal Code. Police recovered the sawed-off butt of defendant's .22-caliber rifle.

Defendant's vehicle was discovered parked directly in front of building C. Inside the vehicle was a book entitled Modern Law Enforcement Weapons and Tactics. Text in portions of the book concerning lethal shotgun ammunition had been circled or underlined, and the first page of a chapter entitled Special Weapons and Tactics had been turned down.

Defendant submitted to a videotaped interrogation, which the jury later watched. After being advised of his rights under *Miranda v. Arizona* (1966) 384 U.S. 436 and waiving them, defendant said he did not decide to commit the shootings until the teacher

7

asked him about having a gun permit. Defendant acknowledged he had created a shopping list and drawn up plans, but claimed he did not intend to go through with them. Defendant also admitted he had visited the school a few weeks before and had sawed off the butt of the .22-caliber rifle before the shootings to make it more maneuverable. Defendant said he intended to "wing[] a couple of people" to get the media's attention, but not to kill anyone. Defendant insisted he used No. 4 buckshot, rather than less lethal ammunition, because that was what he used when he went target shooting. Defendant described the assault and said that once he went upstairs he realized what he was doing was wrong.

Autopsies revealed Brens, Davis, Hill, and White were all killed by multiple shots of No. 4 buckshot that caused extensive external and internal injuries. A sheriff's deputy testified that No. 4 buckshot contained approximately 24 projectiles per shell and described them as "[antipersonnel] type rounds" with "devastating" impact power. The diameter of the spread of multiprojectile ammunition fired from a shotgun expanded approximately one inch for every yard traveled.

2. Defense Evidence

Defendant called as witnesses four of the students whom he had taken hostage. They testified that defendant had said he did not know he had killed anyone, was not "aiming to kill anybody," and did not want any of the injured students to die. Defendant expressed shock at his actions and apologized to the final four hostages.

Defendant's half brother, Ronald Caddell, testified about their experiences together. Caddell explained defendant had been fascinated with military equipment and firearms since the age of 12 or 13. Defendant often practiced shooting, and they had gone target shooting together two or three times. Defendant worked for a temporary agency that had a contract with Hewlett-Packard, but his contract had expired a few months before the shootings. Defendant could have obtained a job at Hewlett-Packard if he had had a high

8

school diploma or equivalency certificate. Caddell had argued with defendant about his not looking for work. In the weeks leading up to the shootings, defendant ate little, stayed up late, and was heard handling his firearms. Caddell and defendant were fans of action movies, especially The Terminator (Hemdale Film Corp., 1984).

C. Jess Groesbeck, an associate professor at the University of California, Davis Medical School (UC Davis Medical School) who was board certified in psychiatry, psychoanalysis, and forensic psychiatry, evaluated defendant. Dr. Groesbeck reviewed the police reports, other doctors' reports, and defendant's medical and school records. He also interviewed defendant on different occasions. In his testimony, Dr. Groesbeck described several traumatic events in defendant's family: His mother had been abused by several family members; a maternal uncle had killed three people in a fight; his maternal grandmother had committed suicide; and his father, who was an alcoholic, had abandoned the family when defendant was a young child. According to Dr. Groesbeck, defendant suffered from spinal meningitis and severe asthma as an infant. As a child, defendant had problems learning in school, paying attention, and controlling his behavior; he had been classified as "learning handicapped." Defendant's IQ had dropped from 95 to 84 around the age of 16. Defendant had twice attempted to commit suicide, once in 1988 and once while in custody awaiting trial.

Dr. Groesbeck noted defendant felt guilty about "quasi-homosexual seeking behavior" he had with Rewerts, his best friend. As a young child, defendant had been photographed wearing a dress, which, in Dr. Groesbeck's opinion, contributed to defendant's sexual identity confusion and caused his fascination with firearms. Dr. Groesbeck related defendant's claim that Brens, the teacher he shot and killed, had molested him at least twice in 1989.

Dr. Groesbeck diagnosed defendant as suffering from "organic brain syndrome," that is, chronic, permanent brain damage. According to Dr. Groesbeck, defendant also suffered from "a developmental disorder, as well as a hyperactivity syndrome, which he

9

had as a child, most likely." Dr. Groesbeck also diagnosed defendant as suffering from dependent personality disorder, as well as borderline personality disorder, manifested by extreme mood swings, and suggested that defendant's contact with reality was unstable. Dr. Groesbeck further diagnosed defendant as suffering from post-traumatic stress disorder (PTSD), which could have been caused by having been molested. Dr. Groesbeck suggested defendant had a dissociative reaction to the shootings and screened out the memories or did not see himself as involved in what happened.

In Dr. Groesbeck's opinion, defendant also suffered from psychotic schizophreniform disorder, "the most serious of all mental illnesses," in which the mind "literally disorganizes at all levels." During the shootings, Dr. Groesbeck believed defendant was "dissociated, [detached], living in an unreal world," and identifying with the self-sacrificing protagonists in his favorite action movies. Dr. Groesbeck characterized defendant's preshooting writings as examples of his internal struggles overwhelming his ability to maintain contact with reality.

Helaine Rubinstein, Dr. Groesbeck's associate and a psychologist who specialized in neuropsychology and diagnosing and treating mental disorders of youth, also evaluated defendant. Dr. Rubinstein reviewed police reports, defendant's medical and school records, some of his writings, interviews of his mother and brother, his interrogation by the police, and the audiotapes of the hostage situation. She also spent about 50 hours interviewing him and administering tests. Dr. Rubinstein found defendant to be significantly disoriented, dissociative, delusional, and suffering from auditory and visual hallucinations.

Dr. Rubinstein diagnosed defendant as suffering from "Specific Developmental Disorder, Not Otherwise Specified, Chronic," specifically, brain damage on the left hemisphere that impaired his ability to understand orally conveyed information. Such a disorder could be the result of physical abuse or a childhood illness such as spinal meningitis. Dr. Rubinstein also diagnosed defendant as suffering from "Attention

10

Deficits, Hyperactivity Disorder, Residual Phase," that is, childhood hyperactivity marked by an inability to concentrate. Dr. Rubinstein agreed with Dr. Groesbeck that defendant suffered from PTSD, which she opined was caused by his claimed molestation, and explained that his inability to recall certain facts of the shootings was consistent with PTSD. Like Dr. Groesbeck, Dr. Rubinstein diagnosed defendant as suffering from a paranoid type of a schizophreniform disorder. In Dr. Rubinstein's opinion, the onset of defendant's disorder occurred approximately a month before the shootings and had escalated since then.

Dr. Rubinstein also detected that defendant had a "Savior Syndrome," which is a delusion of grandeur involving the belief that he was a special servant of a higher power. Defendant had told Dr. Rubinstein that he intended to take Brens hostage and disclose all the wrongdoings of the school system.

Defendant's friend, Ricardo Borom, testified that in 1989, defendant had told him that he had permitted a high school teacher named Robert to fondle him and then orally copulate him in exchange for a passing grade.

### 3. Prosecution Rebuttal Evidence

Rewerts, defendant's best friend, admitted that they had had sexual contact once in 1991. Rewerts and defendant were very close and discussed sexual matters, but defendant never told Rewerts about Brens's claimed acts of molestation. On cross-examination, Rewerts admitted defendant and he at one point had had a falling out because defendant had started to date an ex-girlfriend of Rewerts's, and Rewerts wanted to have an exclusive sexual relationship with defendant.

Lindhurst High School's records indicated that during his senior year (1988-1989) defendant had taken two classes taught by Brens: civics and economics. Defendant passed civics but failed economics. Following his senior year, defendant attended a

11

summer school session for nongraduating seniors and again failed economics; Brens did not teach the summer school class.

B. Sanity Trial

1. Defense Evidence

Dr. Groesbeck reviewed his notes from his interviews of defendant, defendant's interrogation by the police, another doctor's report, and a number of other documents, and interviewed defendant two more times. Dr. Groesbeck reaffirmed his opinion that defendant suffered from permanent brain damage, a developmental disorder, hyperactivity syndrome, dependent personality disorder, borderline personality disorder, PTSD, and psychotic schizophreniform disorder. According to Dr. Groesbeck, testing indicated that defendant was detached and suffered from diminished ability to abstract, conflicted feelings, and poor impulse control. He also suffered from hallucinations that would command him to do unrealistic things. Dr. Groesbeck said his diagnosis would have remained the same even assuming defendant had fabricated the molestation allegations. Although defendant had told the hostages that Brens had flunked him, Dr. Groesbeck thought defendant's failure to also mention the molestations to them did not indicate that he had made up the allegations.

In Dr. Groesbeck's opinion, defendant was aware of the nature and quality of his acts during the shootings, and his awareness grew during the hostage situation. Dr. Groesbeck testified, however, that defendant was in a dissociated, depersonalized state and was not capable of distinguishing right from wrong.

2. Prosecution Evidence

Captane Thomson, a clinical professor at UC Davis Medical School who is board certified in psychiatry and forensic psychiatry, also interviewed defendant. After reviewing Dr. Groesbeck's and Dr. Rubinstein's testimony, defendant's medical and school reports, and interviews of defendant's family members, Dr. Thomson disagreed

12

that defendant suffered from schizophreniform psychosis. He believed defendant's symptoms were indicative of a mood disorder such as psychotic depression.

In Dr. Thomson's opinion, at the time of the crimes, defendant understood the nature and quality of his acts, and knew what he did was legally and morally wrong. Dr. Thomson explained that even a psychotic person may understand the nature and quality of his or her actions. Dr. Thomson believed defendant's preshooting writings were evidence that he was planning to do something he knew was both legally and morally wrong.

Charles Schaffer, a board-certified psychiatrist and former professor at UC Davis Medical School, interviewed defendant and reviewed the police reports and materials, interviews of witnesses, defendant's psychiatric and medical records, and his psychological test results. He diagnosed defendant as suffering from major depression with psychotic features and possibly bipolar disorder. Dr. Schaffer believed defendant also probably suffered from an unspecified personality disorder. Dr. Schaffer noted defendant showed symptoms of PTSD and possible caffeine intoxication on the day of the shootings based upon defendant's claim that he had taken eight or nine caffeine pills and drunk four or five cups of coffee before the shootings. In Dr. Schaffer's opinion, during the shootings defendant was capable of understanding the nature and quality of his acts and could distinguish right from wrong. Dr. Schaffer did not diagnose defendant as suffering from a schizophrenic disorder, but even assuming that diagnosis was correct, Dr. Schaffer said it would not alter his opinion that defendant understood the nature and quality of his acts and was able to distinguish right from wrong.

C. Penalty Phase

    1. Prosecution Evidence

The prosecutor introduced into evidence seven photographs taken during the four autopsies. The jury also viewed a videotape, played without sound but narrated by a detective, that depicted the crime scene; it included images of the four dead bodies.

    2. Defense Evidence

During the penalty phase, defendant's mother testified about his difficult upbringing. His former supervisor testified about his excellent work habits. Defendant testified about the shootings and his relationship with Brens, the teacher he killed.

Defendant's mother, Edith Houston, testified about his physical illnesses as a child, the breakup of her marriage, his social and mental problems, and his difficulties in school. Defendant had an older sister as well as an older half brother, Caddell, from Edith's prior marriage. As a child, defendant suffered from encephalitis or meningitis and severe pneumonia, which delayed his development. Defendant's father drank and was unfaithful, and he and Edith fought. When defendant was a year old, his father left and thereafter visited only infrequently. Edith had suicidal thoughts.

Defendant did not do well in school. Defendant's elementary school classified him as a "slow learner" and placed him in special classes. Defendant continued in special education classes during junior high and high school.

During high school, Edith had difficulty controlling defendant, so she sent him to live with his father and stepmother in Arkansas. Defendant soon begged to return, claiming his father was very strict with him and was drinking and "into a lot of heavy drugs."

During high school, defendant attempted to commit suicide. But he also talked other students out of committing suicide.

After leaving high school, defendant attempted to work. Donna Mickel, defendant's supervisor at Hewlett-Packard, testified she considered defendant an ideal employee

14

whom she wanted to hire after his contract had expired. According to Edith, defendant started to change after his contract at Hewlett-Packard ended. He spent much of his time alone; he was depressed and quick to start an argument.

Defendant drank some and had tried marijuana, and Edith thought he had tried other drugs. Defendant had no prior trouble with law enforcement.

Edith described defendant as shy, not comfortable in groups of people, and more comfortable with children than with people his own age. Other than perhaps occasionally hitting his sister, defendant was not violent and did not pick on other people.

Edith loved defendant and wanted him to live. Defendant was artistic, and Edith believed he could contribute to society by creating works of art. Defendant expressed to Edith remorse for the problems he had caused his family.

Defendant testified about his childhood and upbringing. In particular, he testified that during the second semester of his junior year, Brens was his United States history teacher. His relationship with Brens was "pretty good," but they did get into some arguments. Defendant said Brens sometimes had "snotty attitudes" but was "pretty professional" and a "good teacher."

In his senior year, defendant took Brens's economics class. According to defendant, there were some out-of-control students who agitated Brens, who in turn took out his frustrations on the rest of the class. In December or January of his senior year, defendant went to talk to Brens about a paper for the class. While they were alone, defendant claimed, Brens rubbed his hands on the crotch of defendant's pants. Defendant did not report the incident. After that, defendant and Brens had some arguments. Toward the end of the school year, defendant again went to talk to Brens about a paper. Defendant claimed that while he and Brens were alone in the classroom, Brens reached into his pants, grabbed his penis, and twisted it, causing excruciating pain.

Defendant said he felt unable to report these incidents, and he believed that if he had done so, Brens would not have gotten in trouble. Although Borom, defendant's friend,

15

testified that defendant told him that a teacher named Robert had orally copulated him, defendant could not recall either the incident or telling Borom about it because, he said, he was intoxicated while talking to Borom.

After these incidents, Brens rebuffed defendant's attempt to discuss his failing grade. Brens failed defendant, and he did not graduate. Defendant attempted to retake the class during summer school but said he failed due to the "mental strain of the molestation."

Defendant testified that he was "laid off" in early 1992 because he lacked a high school diploma and that he did not understand why a diploma was required for his job. During the month leading up to the shootings, defendant's thoughts were "very distorted." When both awake and asleep, defendant heard Brens's voice. When defendant was asleep, he would see people laughing at him and hear people telling him to go to the high school.

Defendant said that although he drew up his plans a few days before the shootings, he did not intend to go through with it until he heard voices nagging him to go to the high school. Defendant admitted that the night before the shootings, he sawed off the stock of the .22-caliber rifle to "make it smaller and more versatile."

Defendant recounted the events on the day of the shootings. Throughout the day, he heard voices encouraging him. Defendant claimed he did not intend to shoot people but rather "just start blowing stuff up." By the time he entered the second story of the school, the voices in defendant's head were silent.

Since his incarceration, defendant continued to have auditory and visual hallucinations. Medication lessened the hallucinations.

Defendant expressed remorse for his actions. He apologized to the living victims and to the families of those who had died. Defendant did not see a value in his execution but felt a fair punishment would be whatever the victims' families wanted.

## II.

### A. Pretrial Claims

#### 1. Composition and Conduct of the Grand Jury

Defendant contends that his September 15, 1992 indictment was defective because the grand jury members were selected with "constitutionally impermissible methods" and its proceedings were "prejudicially flawed." Before the start of his trial, defendant moved to set aside the indictment, asserting four distinct challenges, all of which the trial court rejected. On appeal, defendant renews three of these challenges, which we address in turn below.

As preface to our discussion, we note that in these claims and most others on appeal, defendant contends that the asserted error or misconduct he raises infringed his state and federal constitutional rights to a fair and reliable trial. What we stated in *People v. Boyer* (2006) 38 Cal.4th 412, 441, footnote 17 (*Boyer*), applies in the present case: "In most instances, insofar as defendant raised the issue at all in the trial court, he failed explicitly to make some or all of the constitutional arguments he now advances. In each instance, unless otherwise indicated, it appears that either (1) the appellate claim is of a kind (e.g., failure to instruct sua sponte; erroneous instruction affecting defendant's substantial rights) that required no trial court action by the defendant to preserve it, or (2) the new arguments do not invoke facts or legal standards different from those the trial court itself was asked to apply, but merely assert that the trial court's act or omission, insofar as wrong for the reasons actually presented to that court, had the additional *legal consequence* of violating the Constitution. To that extent, defendant's new constitutional arguments are not forfeited on appeal. [Citations.] [¶] In the latter instance, of course, rejection, on the merits, of a claim that the trial court erred on the issue actually before that court necessarily leads to rejection of the newly applied constitutional 'gloss' as well.

No separate constitutional discussion is required in such cases, and we therefore provide none." (Italics in original.)

### a. Failure to maintain a record of the entire grand jury proceedings

Defendant contends that the transcript of the grand jury proceedings is incomplete and therefore violated his statutory right to have all proceedings in his death penalty case conducted with a court reporter present. (§ 190.9, subd. (a)(1) [in any case in which the death penalty may be imposed, "all proceedings" must be conducted on the record with a court reporter present].) The record indicates that four times during the grand jury's proceedings, the prosecutor went "off the record" by requesting that the court reporter not transcribe the proceedings. These instances occurred during the prosecutor's opening statement, during his closing argument, during a recess in which a juror's unspecified question was addressed, and during a discussion that occurred after a witness finished testifying.

The Attorney General concedes that some of the grand jury proceedings were improperly conducted without a court reporter present. The parties disagree, however, on whether a showing of prejudice is necessary for us to reverse the judgment based on this error. Defendant relies on *Dustin v. Superior Court* (2002) 99 Cal.App.4th 1311 (*Dustin*), in which the prosecutor ordered the court reporter to leave the grand jury room during his opening statement and closing argument. Based on this irregularity, the defendant filed a pretrial motion to dismiss the indictment. When the trial court denied the motion, the defendant filed a petition for a writ of mandate in the Court of Appeal. The Court of Appeal, citing section 190.9, agreed that the defendant was entitled to have these remarks transcribed. (*Id.* at pp. 1321-1323.) The court presumed that the defendant was prejudiced by this omission from the transcript, granted the defendant's mandate petition, and directed the trial court to dismiss the indictment without prejudice to the

18

filing of a complaint or another indictment. (*Id.* at pp. 1325-1328.) The Attorney General contends that *Dustin* was incorrectly decided.

We need not address the Attorney General's concerns about *Dustin* because defendant's reliance on it is misplaced. In *People v. Booker* (2011) 51 Cal.4th 141 (*Booker*), which was, like this case, an automatic appeal from a death judgment, we rejected a complaint about an irregularity that occurred during the grand jury proceedings. We explained that postconviction challenges to irregularities during grand jury proceedings are generally reviewed for prejudice. (*Id.* at p. 156.) In contrast, pretrial challenges to grand jury proceedings, such as those raised by way of a petition for writ of mandate filed before trial, may warrant relief without a showing of prejudice. (*Ibid.*; *Dustin*, *supra*, 99 Cal.App.4th at pp. 1325-1326.) As the Attorney General notes, *Dustin* involved a pretrial challenge to the grand jury proceedings. Because defendant here did not seek pretrial relief in the Court of Appeal for the denial of his motion to set aside the indictment, he is entitled to a postconviction reversal only if the error prejudiced him.

Assuming the failure to transcribe all of the grand jury proceedings implicated defendant's federal constitutional rights, he is entitled to relief unless the prosecution can show beyond a reasonable doubt that the irregularity did not affect the outcome of the trial. (*Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*); see *Booker*, *supra*, 51 Cal.4th at p. 158.) We conclude defendant here is not entitled to relief because the record shows that the evidence presented to the grand jury was sufficient to support an indictment and because defendant "has failed to identify anything other than mere speculation to support his contention that he has suffered prejudice, i.e., that the grand jury's decision to indict may have been in some way influenced by the alleged unreported communications." (*People v. Bennett* (2009) 45 Cal.4th 577, 591-592; cf. *Vasquez v. Hillery* (1986) 474 U.S. 254 [racial animus may have affected grand jury's decision whether and how to charge the defendant].)

19

b. Failure to provide requested evidence

Section 939.7 provides, in pertinent part, that when the grand jury "has reason to believe that other evidence within its reach will explain away the charge, it shall order the evidence to be produced, and for that purpose may require the district attorney to issue process for the witnesses." Defendant contends that the prosecutor violated section 939.7 by refusing to provide the grand jury with evidence it requested. As we explain, defendant's contention lacks merit.

As noted, law enforcement personnel videotaped defendant's interrogation and made audiotapes of the hostage situation. During the proceedings, the prosecutor indicated to the grand jury that one or more jurors had asked if they would be able to review the audio and video recordings. The prosecutor explained to the grand jury that the recordings were obtainable, but that he did not intend to present them. The prosecutor added, "However, if the jury so wishes, then we will do that." He then suggested that the grand jury meet outside the presence of the prosecution to discuss whether it needed any additional evidence. The prosecutor expressly said, "[I]f you feel you need more evidence . . . we're willing to serve whatever the needs of the [grand jury] feels are necessary." The grand jury, however, at no time actually asked the prosecutor to present the recordings. The prosecutor, therefore, did not violate section 939.7 by not presenting them.

Defendant nonetheless contends that the prosecutor's statements dissuaded the grand jury from requesting the evidence and improperly implied that the recordings had no exculpatory value. We are not persuaded that the statements had such an effect. The grand jury was aware that it had the authority to request additional evidence and that the prosecutor was willing to produce the recordings if requested. Hence, defendant suffered no prejudice. (See *Cummiskey v. Superior Court* (1992) 3 Cal.4th 1018, 1029-1034 [prosecutor did not mislead the grand jury into believing it could not request additional evidence].) In addition, defendant has failed to identify anything other than speculation

20

that, had the grand jury considered the recordings, they would have affected its decision to indict.

### c. Underrepresentation of minorities on the grand jury

Defendant contends that the grand jury that indicted him was not a "fair cross-section" of the community because it did not contain anyone from the African American, Native American, Asian Indian, or Hmong communities, all of which, according to defendant, comprised a substantial portion of Yuba County. Although defendant successfully moved to have his cased tried in Napa County, he committed his crimes in Yuba County and was indicted there.

This underrepresentation in Yuba County, defendant contends, violated his right to an impartial jury under the Sixth Amendment to the federal Constitution and article I, section 16 of the California Constitution. Defendant relies upon the rule that a violation of the requirement that a petit jury be drawn from a fair cross-section of the population is established by showing "(1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in the venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process." (*Duren v. Missouri* (1979) 439 U.S. 357, 364.)

In support of his motion in the trial court, defendant introduced evidence that African Americans constituted 4.2 percent of the population of Yuba County, Native Americans constituted 2.9 percent, Asian Indians constituted 0.7 percent, and Hmongs constituted 3.7 percent, whereas Whites accounted for 78.2 percent of the population. The Superior Court for Yuba County had no data regarding the racial or ethnic identity of its grand jury venire members. The grand jurors served for a term of one year, with their term of service starting on July 1, and the parties stipulated that an Asian American

21

served on the 1989-1990 grand jury and that an Asian American and two African Americans served on the 1986-1987 grand jury.

Bonita Marqua, the jury commissioner who presided over the selection of the grand jury that indicted defendant, explained how grand jurors were selected in Yuba County. The Superior Court randomly selected approximately 10,000 people from DMV and voter registration records, and sent juror questionnaires that were to be returned to the court. The grand jury venire was created from those who responded. Returned responses were randomly selected and then added to the previous term's venire. In addition, any member of the public could volunteer or be nominated; such an applicant would be added to the grand jury venire if the presiding judge consented. The venire was capped at 200 people. No special effort was made to encourage racial or ethnic minorities to volunteer for grand jury service.

Court staff and the presiding judge then interviewed the venire members to determine whether they were qualified and able to serve as grand jurors, and excused those who were not. Nineteen people were randomly selected from this smaller group to serve.

Peter Sperlich, a professor of political science at the University of California, Berkeley, testified as an expert in grand jury selection processes. In Dr. Sperlich's opinion, from 1986 to 1993, there was significant underrepresentation of minorities on Yuba County grand juries that he attributed to flaws in the selection process, such as "the lack of follow-up" on those who did not return the initial questionnaire or make an appointment to be interviewed, the lack of a clear policy on granting excusals or deferments, lack of a true random selection of returned questionnaires, the ability of applicants to volunteer or be nominated for grand jury service, and the carrying over of grand jury venire members from term to term.

In denying the motion, the court acknowledged defendant had identified distinctive minority groups in the community. In light of the lack of evidence about the composition

22

of the grand jury venires, however, the court ruled that defendant failed to prove that the representation of these groups on the venires was not fair and reasonable in relation to their numbers in the county. The trial court also noted defendant failed to identify any procedures that systematically excluded members of these groups.

Defendant contends the trial court's selection process for grand jurors systematically excluded various minority groups, which deprived him of a grand jury selected from a fair cross-section of the community. When addressing a similar claim in *People v. Carrington* (2009) 47 Cal.4th 145, 177, we preliminarily noted that neither the high court nor this court has held the fair cross-section rule applies to state grand juries. In rejecting a similar claim in *Carrington*, we cited *People v. Corona* (1989) 211 Cal.App.3d 529, 534-536, which held that lack of a fair cross-section of the community in the grand jury, unlike a finding of intentional racial discrimination, does not compel automatic reversal. Citing the "general rule prohibiting reversal absent actual prejudice," the court in *Corona* rejected the fair cross-section claim. (*Id.* at p. 537.) We followed this process in *Carrington* and similarly rejected the fair cross-section claim in that case because there was no prejudice apparent in the record before us. (*Carrington*, *supra*, 47 Cal.4th at p. 179.)

We need not and do not resolve whether the Sixth Amendment right to a fair cross-section of the community applies to state grand juries because the record before us supports the trial court's assessment that defendant failed to make a showing of underrepresentation of these groups on the venires in relation to their numbers in the county. (Cf. *Castaneda v. Partida* (1977) 430 U.S. 482, 487-488 [prima facie case of intentional discrimination against Mexican-Americans in grand jury selection process established by examining jurors' surnames].) Defendant contends the trial court's lack of records regarding the ethnicity of the grand jurors violated his due process rights, but he fails to supply any authority for this contention. Accordingly, we conclude defendant

failed to demonstrate evidence of substantial underrepresentation over a significant period of time on the grand jury.

### 2. Administration of Oath to Prospective Jurors

Defendant notes the record fails to establish that the trial court questioned prospective jurors under oath. Defendant therefore contends that the trial court's failure to administer the oath to prospective jurors violated his rights to due process and an impartial jury as well as his right to have all proceedings transcribed. As noted, subdivision (a)(1) of section 190.9 requires that all proceedings in death penalty cases be transcribed.

In addition, Code of Civil Procedure section 232 requires all prospective jurors, before being examined and upon selection, to take an oath of truthfulness: "(a) Prior to the examination of prospective trial jurors in the panel assigned for voir dire, the following perjury acknowledgement and agreement shall be obtained from the panel, which shall be acknowledged by the prospective jurors with the statement 'I do': [¶] 'Do you, and each of you, understand and agree that you will accurately and truthfully answer, under penalty of perjury, all questions propounded to you concerning your qualifications and competency to serve as a trial juror in the matter pending before this court; and that failure to do so may subject you to criminal prosecution.' [¶] (b) As soon as the selection of the trial jury is completed, the following acknowledgment and agreement shall be obtained from the trial jurors, which shall be acknowledged by the statement 'I do': [¶] 'Do you and each of you understand and agree that you will well and truly try the cause now pending before this court, and a true verdict render according only to the evidence presented to you and to the instructions of the court.' "

On June 8, 1993, the trial judge went to the jury assembly room and addressed on the record a panel of 172 prospective jurors. The prospective jurors were first given blank declarations to request excusal from jury duty due to the hardship of serving; these

24

were signed under penalty of perjury. The parties stipulated to the dismissal of 40 prospective jurors, and additional prospective jurors were granted hardship dismissals. Each remaining prospective juror was given a questionnaire, which sought to discover bias and views on the death penalty. Although the questionnaires indicated they were to be completed under penalty of perjury, they did not call for a signature, and the prospective jurors did not sign them.

The next morning, 35 prospective jurors were called into the courtroom. The trial court stated, "They have already been sworn for voir dire in the — by the jury commissioner, true, or — they're nodding yes. That's the usual procedure . . . ." These prospective jurors were examined, and successive groups of prospective jurors were called in until all remaining members of this panel had been examined. A second panel of approximately 120 additional prospective jurors were also similarly examined. The record is silent as to whether they were administered any oath. A jury ultimately was chosen. Only one seated juror was from the original group of 35 prospective jurors who affirmatively acknowledged taking an oath.

In 2003, the trial court conducted record correction proceedings and ordered the record to be settled to indicate that both panels of prospective jurors were administered the oath required by subdivision (a) of Code of Civil Procedure section 232 before the court conducted voir dire.

Defendant preliminarily contends that the trial court improperly settled the record. It is the trial court's duty to settle the record, not to make one. (*Marks v. Superior Court* (2002) 27 Cal.4th 176, 195.) Although record settlement may be based on all available aids, including the memories of the trial judge and the attorneys (*id.* at pp. 195-196), none of the participants in the record correction proceedings had witnessed the jury commissioner swearing in the prospective jurors, and no court personnel testified at the record correction proceedings. Although the first group of prospective jurors indicated they had been sworn in while in the jury assembly room, and the trial court added that

25

was "the usual procedure," there is no record of who was sworn in, who administered the oath, or what oath was administered.

In settling the record to indicate that all of the prospective jurors were administered the correct oath, the trial court also relied on section 664 of the Evidence Code, which states in pertinent part, "It is presumed that official duty has been regularly performed." As noted, the record shows the first panel of prospective jurors indicated that the jury commissioner administered an oath. (E.g., *People v. Wader* (1993) 5 Cal.4th 610, 661 [official duty presumption includes actions by court clerks].) Defendant does not make a particularized showing that no oath was administered, that the wrong oath was administered, or that not all prospective jurors were administered the oath. (See Evid. Code, § 660 [evidentiary presumptions affect the burden of proof].) Although there is no record that all prospective jurors were administered the correct oath, this absence does not alter the presumption that the correct oath was administered. (See *People v. Mello* (2002) 97 Cal.App.4th 511, 513-514, fn. 1 [despite its absence from the record, appellate court presumed the oath of truthfulness was properly administered to prospective jurors].) Thus, despite the trial court improperly "correcting" the record to indicate the prospective jurors were administered the oath of truthfulness, defendant is not entitled to relief because under Evidence Code section 664, it is presumed they were properly sworn in.

With respect to the trial court's failure to cause the court reporter to transcribe the administration of the oath, we cannot presume that the court reporter transcribed it because it is not in the record. (E.g., *Mountain Lion Foundation v. Fish & Game Com.* (1997) 16 Cal.4th 105, 132 [reliance on official duty presumption is misplaced when the record discloses a duty was not properly performed].) Although the trial court failed to cause the administration of the prospective jurors' oath to be transcribed, defendant is not entitled to relief because any error was harmless. (See *People v. Taylor* (2010) 48 Cal.4th 574, 659-660 (*Taylor*) [failure to conduct on-the-record discussions about the jury's questions to the court in a death penalty case was harmless error].)

26

Defendant's reliance on *In re Smiley* (1967) 66 Cal.2d 606 is misplaced. In *Smiley*, the petitioner claimed he was not advised of his right to a speedy trial, and he disputed the minute order that indicated he had "waived time." (*Id.* at p. 611.) The applicable law required the trial court to explain to the petitioner his right to a speedy trial and the effect of his consent to the trial date set by the trial court, but the record did not indicate it had done so. (*Id.* at p. 629.) We declined to presume that the trial court had performed its official duty and advised the petitioner because the purpose of the law was to ensure that a defendant would not waive his or her rights through ignorance or oversight. (*Id.* at pp. 629-630.) Such a purpose would have been defeated if the petitioner had been required to prove that the trial court did not advise him about a right that he did not know he had. (*Ibid.*) Here, defendant's claim does not involve the advisement or waiver of any rights.

Even if we assume that some of the prospective jurors were not administered the oath required by subdivision (a) of Code of Civil Procedure section 232, defendant's claim does not warrant reversal in light of *People v. Carter* (2005) 36 Cal.4th 1114. In *Carter*, the trial court failed to administer the oath of truthfulness to two panels of prospective jurors, but it denied the defendant's motion to declare a mistrial or, alternatively, to excuse the prospective jurors who had not been given the oath before being examined. (*Id.* at pp. 1174-1176.) We rejected the defendant's argument that the failure to administer the oath to prospective jurors was a structural defect that compelled an automatic reversal. (*Id.* at p. 1175.) Rather, we noted that the properly sworn seated jurors were instructed to follow the trial court's instructions, and we presumed they did. (*Id.* at pp. 1176-1177; see Code Civ. Proc., § 232, subd. (b).) We also noted that those prospective jurors filled out a questionnaire that was signed under penalty of perjury, which impressed upon them the importance of being truthful, thus lessening the harm caused by failure to administer oath of truthfulness. (*Carter*, *supra*, 36 Cal.4th at p. 1177.) We therefore concluded that the failure to administer the oath to some of the

27

prospective jurors was not prejudicial. (*Ibid.*) Here, as in *Carter*, any error in failing to properly swear in the prospective jurors was harmless under the applicable federal and state standards (*Chapman*, *supra*, 386 U.S. at p. 24; *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*)) because the prospective jurors were instructed to complete the questionnaires under penalty of perjury and because the seated jurors were administered the proper oath. We reject defendant's contention that *Carter* and *People v. Lewis* (2001) 25 Cal.4th 610, upon which *Carter* relied, should be reconsidered.

Defendant notes that the prospective jurors in *Carter* had signed their questionnaires under penalty of perjury. But we see no basis for concluding that defendant was prejudiced by the fact that here the prospective jurors did not sign their questionnaires. The questionnaire clearly instructed the prospective jurors that they were to complete it under penalty of perjury. Absent evidence to the contrary, and defendant has provided none, we presume the prospective jurors followed the instruction.

B. Guilt Phase Claims

1. Lack of Meaningful Appellate Review Due to an Incomplete Record

During his case-in-chief, the prosecutor introduced into evidence videotapes of defendant's interrogation by law enforcement personnel and audiotapes made during the hostage situation. Defendant contends that the trial court improperly allowed the prosecutor to play for the jury these audio and video recordings. Because the recordings were of poor quality and were not transcribed by the court reporter, defendant argues, the record is incomplete and violates his right to meaningful appellate review. As noted, subdivision (a)(1) of section 190.9 requires that all proceedings in death penalty cases be transcribed. Former rule 203.5 (now rule 2.1040) of the California Rules of Court required the party offering an audio or video recording into evidence to provide the court and opposing parties a transcript of the recording.

During the prosecutor's case-in-chief, the jury viewed two videotapes of law enforcement personnel interrogating defendant. Before the videotapes were played, the following colloquy occurred:

"THE COURT: The court reporter need not try to take down the audio portion of any videotape?

"[¶] . . . [¶]

"[DEFENSE COUNSEL]: Well, I'm afraid I would get in trouble if I said otherwise.

"THE COURT: I don't want you to be intimidated in the diligent exercise of your duty as defense counsel. If you wish to say otherwise, you may.

"[DEFENSE COUNSEL]: No, we have no objection."

The prosecutor later introduced into evidence a transcript, presumably created by law enforcement personnel, of the videotapes. Defense counsel stated, "We have no, no vigorous objection to the introduction of that as an exhibit. With the understanding that the Court will instruct the jury that the tape is the evidence and not the transcript." The trial court instructed the jury that the transcript was an aid to understanding the interrogation, but if there was a conflict between the videotapes and the transcript, the videotapes controlled.

As noted, during the hostage situation, law enforcement personnel delivered to defendant a portable telephone system that could record sounds even when not being used as a telephone. Seven audiotapes of what it recorded were introduced into evidence without objection. The audiotapes were played for the jury, and the parties stipulated that the court reporter was excused from transcribing the audio recordings. No transcript of the audiotapes was provided to the jury.

Because defendant agreed that the court reporter need not transcribe the audio and video recordings, he cannot now complain of such errors on appeal. (*People v. Rogers* (2006) 39 Cal.4th 826, 856-858 [defendant's stipulation to not transcribe certain death

penalty proceedings forfeited the claim on appeal]; see also *Taylor*, *supra*, 48 Cal.4th at pp. 659-660 [failure to conduct death penalty proceedings on the record regarding questions posed by the jury was harmless error where the trial court summarized the unreported discussions and defendant did not object to the summation].)  That the trial court rather than defendant raised the transcription issue is not determinative:  the trial court invited defendant to object to the court reporter not transcribing the audio and video recordings, and he expressly declined to do so.  We similarly reject defendant's assertion that the trial court coerced him into agreeing to forgo the transcription.

To the extent defendant contends that these recordings and the transcript were improperly admitted into evidence, this claim is forfeited on appeal because defendant did not object on this ground at trial.  (Evid. Code, § 353, subd. (a) [judgment will not be reversed due to the erroneous admission of evidence unless "an objection to or a motion to exclude or to strike the evidence . . . was timely made and so stated as to make clear the specific ground of the objection or motion"]; *People v. Zamudio* (2008) 43 Cal.4th 327, 354.)  Defendant did not object to the lack of a transcript of the audiotapes or to the fact that he was not given a transcript of the videotapes in a timely manner.  To the extent defendant contends that the transcript of the videotapes lacked foundation and was thus inadmissible, he has forfeited this claim, too, by not objecting at trial.  Similarly, defendant may not argue that the poor quality of the video and audio recordings rendered them inadmissible because he did not object on that ground at trial.  And because defendant failed to request that the trial court review the recordings and the transcript before admitting them into evidence, he has also forfeited these claims on appeal. (Cf. *People v. Polk* (1996) 47 Cal.App.4th 944, 951 [defendants twice moved to exclude an audiotape and a transcript of disputed accuracy].)

Even assuming that the trial court improperly admitted these recordings and the transcript, defendant fails to demonstrate prejudice because the other properly admitted evidence of his guilt was overwhelming.  Some of defendant's statements on the

audiotapes and videotapes did indicate his attack on the school was a premeditated and deliberate act, but that was not the only evidence of his state of mind. His extensive preparations such as his study of police tactics, his purchase of lethal ammunition, and his letter to his family were all evidence from which the jury could have inferred that his actions were part of a preconceived plan.

Defendant contends that the record of what the jury actually heard is so inaccurate and incomplete that meaningful appellate review is impossible. In support of this claim, defendant notes that when the parties prepared a revised version of the transcript of the videotapes during record correction proceedings, there were substantial differences between the original and revised transcripts. However, notwithstanding the alleged inaccuracy of the original transcript, the trial court specifically instructed the jury that the videotapes and not the transcript were the relevant and controlling evidence. Absent evidence to the contrary, and defendant has provided none, we presume the jury followed this instruction. (See, e.g., *People v. Guerra* (2006) 37 Cal.4th 1067, 1115 (*Guerra*), overruled on another point by *People v. Rundle* (2008) 43 Cal.4th 76, 151.)

In the end, it is true that we do not have a court reporter's transcript of the audio and video recordings, and we cannot recreate the conditions under which they were played for the jury. However, it is sufficient that the record contains these recordings and defendant had access to them. Defendant did in fact review them. Although the recordings were made some time ago, our independent review of them discloses that they are sufficiently clear. Accordingly, defendant's right to meaningful appellate review has not been jeopardized.

### 2. Sufficiency of the Evidence

At the close of the prosecutor's case-in-chief, defendant moved pursuant to section 1118.1 to dismiss the first degree murder and attempted murder counts. Section 1118.1 provides in pertinent part: "In a case tried before a jury, the court on motion of the

defendant or on its own motion, at the close of the evidence on either side and before the case is submitted to the jury for decision, shall order the entry of a judgment of acquittal of one or more of the offenses charged in the accusatory pleading if the evidence then before the court is insufficient to sustain a conviction of such offense or offenses on appeal." The trial court denied the motion, and defendant argues the court erred in so ruling.

An appellate court reviews the denial of a section 1118.1 motion under the standard employed in reviewing the sufficiency of the evidence to support a conviction. (*People v. Whisenhunt* (2008) 44 Cal.4th 174, 200.) "In reviewing a challenge to the sufficiency of the evidence, we do not determine the facts ourselves. Rather, we 'examine the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence — evidence that is reasonable, credible and of solid value — such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citations.] We presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. [Citation.] [¶] The same standard of review applies to cases in which the prosecution relies primarily on circumstantial evidence and to special circumstance allegations. [Citation.] '[I]f the circumstances reasonably justify the jury's findings, the judgment may not be reversed simply because the circumstances might also reasonably be reconciled with a contrary finding.' [Citation.] We do not reweigh evidence or reevaluate a witness's credibility." (*Guerra*, *supra*, 37 Cal.4th at p. 1129.) Review of the denial of a section 1118.1 motion made at the close of a prosecutor's case-in-chief focuses on the state of the evidence as it stood at that point. (*People v. Cole* (2004) 33 Cal.4th 1158, 1213.)

As we explain below, this claim lacks merit, as does defendant's related contention that the totality of the evidence presented during the guilt phase was insufficient to sustain these convictions.

### a. First degree murder counts

Defendant contends that the evidence at trial demonstrated that he killed Brens, Davis, Hill, and White as a result of an "unconsidered or rash impulse" rather than with the premeditation and deliberation required for first degree murder. (See §§ 187, subd. (a), 189.)

"In the context of first degree murder, ' "premeditated" means "considered beforehand," and "deliberate" means "formed or arrived at or determined upon as a result of careful thought and weighing of considerations for and against the proposed course of action." [Citation.]' [Citation.] 'The process of premeditation and deliberation does not require any extended period of time. "The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly . . . ." [Citations.]' [Citation.] 'In [*People v. Anderson* (1968) 70 Cal.2d 15], we "identified three categories of evidence relevant to resolving the issue of premeditation and deliberation: planning activity, motive, and manner of killing." [Citation.] However, these factors are not exclusive, nor are they invariably determinative. [Citation.] " '*Anderson* was simply intended to guide an appellate court's assessment whether the evidence supports an inference that the killing occurred as the result of preexisting reflection rather than unconsidered or rash impulse.' " ' " (*People v. Lee* (2011) 51 Cal.4th 620, 636 (*Lee*).) The evidence here supports each of the identified factors.

The prosecutor presented overwhelming evidence of planning. Defendant reconnoitered the school and created a diagram of the school entitled "Mission Profile." He studied law enforcement tactics. He wrote a "goodbye" letter to his family telling them they should not blame themselves for his actions. He purchased the necessary supplies before heading to the school. And he brought two different loaded firearms, including the .22-caliber rifle whose stock he had sawed off the night before, and spare

ammunition to the school. This evidence indicated that he had considered the possibility of not only a violent encounter but an encounter involving multiple targets.

Similarly, the prosecutor presented ample evidence of defendant's motive. Defendant told the hostages and law enforcement personnel that Brens had ruined his life by flunking him. Defendant blamed the school system for allowing this to happen and wanted to "make a point" to ensure it did not happen again. Although defendant appeared to have harbored no personal animosity toward Davis, Hill, and White, a reasonable trier of fact could have concluded he believed that killing students would draw attention to himself and his plight, or that they were simply innocent targets of his misdirected anger.

The prosecutor's evidence also showed that defendant's demeanor during the killings appeared to be controlled. For example, Kaze described him, in the midst of the carnage, as having "a slight smile on his face and a spring to his step." This evidence supports the conclusion that defendant's actions were the result of preexisting thought and reflection rather than an unconsidered rash impulse.

Defendant nonetheless contends that the evidence showed that he planned only to kill himself at the school but then changed his mind at the last instant and decided instead to shoot off his firearms or perhaps wound people or take hostages in an effort to get attention. While such a scenario might be possible, we presume in support of the verdict the existence of every fact that can be reasonably inferred from the evidence. Given the extensive evidence of defendant's preparations for his assault, a reasonable trier of fact could have found defendant guilty of four counts of first degree murder on a premeditation and deliberation theory.

To the extent defendant contends that the "the quality and quantum of proof distinguishing deliberate premeditated murder from second degree murder" is "undefined and undecipherable," we disagree. Killing resulting from preexisting reflection is readily distinguishable from a killing based on an unconsidered or rash impulse (*People v.*

34

*Solomon* (2010) 49 Cal.4th 792, 812-813), and the evidence in this case allowed a reasonable trier of fact to find the former beyond a reasonable doubt.

### b. Attempted murder counts

Defendant contends that the evidence at trial failed to demonstrate that he shot at Boggess, Collazo, Gipson, Graham, Hinojosai, Kaze, Martinez, Rodriguez, Scarberry, and Yanez with the specific intent to kill necessary for attempted murder. (§§ 187, subd. (a), 664.)

"Attempted murder requires the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing. [Citation.] Attempted murder requires express malice, that is, the assailant either desires the victim's death, or knows to a substantial certainty that the victim's death will occur." (*Booker*, *supra*, 51 Cal.4th at pp. 177-178.)

Defendant contends that the evidence at trial did not demonstrate that he intended to kill the attempted murder victims, none of whom he knew. Defendant notes that, for some of the attempted murder victims, there was no evidence that he specifically aimed at them. Also, for some of the victims, the evidence showed that although they were clearly alive after they had been shot, defendant made no further attempt to kill them.

Defendant relies on *People v. Murtishaw* (1981) 29 Cal.3d 733 (*Murtishaw*) overruled on another point by *People v. Boyd* (1985) 38 Cal.3d 762, 772-773, in which we examined the jury instructions for the defendant's conviction of assault with intent to commit murder. There, the jury was instructed that the crime required evidence of a specific intent to commit murder, but the jury was also given definitions of murder that did not require an intent to kill, that is, implied malice murder or felony murder. (*Id.* at p. 763.) Defendant here, however, does not contend the jury was improperly instructed about the necessary intent. Instead, he contends that the evidence at trial did not demonstrate an intent to kill.

35

The act of shooting a firearm toward a victim at close range in a manner that could have inflicted a mortal wound had the shot been on target is sufficient to support an inference of an intent to kill. (*People v. Smith* (2005) 37 Cal.4th 733, 741 (*Smith*).) Moreover, attempted murder does not necessarily require a specific target. We have held that an indiscriminate would-be killer who fires into a crowd is just as culpable as one who targets a specific victim. (E.g., *People v. Perez* (2010) 50 Cal.4th 222, 230.) The totality of the evidence established that defendant repeatedly and intentionally discharged a shotgun loaded with antipersonnel, multiprojectile ammunition at close range toward his victims in a manner that could have inflicted a mortal wound. This is sufficient to sustain these convictions.

In addition, motive is not an element of the crime of attempted murder. (E.g., *Smith*, *supra*, 37 Cal.4th at pp. 740-741.) That defendant did not know his victims or bear them any ill will does not demonstrate that he lacked the intent to kill. Although motive is often probative of an intent to kill, the absence of a clear motive does not demonstrate the lack of an intent to kill. Moreover, as with Davis, Hill, and White, a reasonable trier of fact could have concluded that the attempted murder victims were simply targets of defendant's misdirected anger or part of his scheme to draw attention to his plight. That defendant did not shoot even more people does not mean he lacked a motive or the specific intent to kill those whom he did shoot.

Similarly, it is not dispositive that defendant did not kill some of his wounded victims. That defendant may have fired once and then abandoned his efforts does not compel the conclusion he lacked the intent to kill in the first instance. (E.g., *Smith*, *supra*, 37 Cal.4th at p. 741.) Defendant may not have finished off these victims for any number of reasons, such as the desire to continue his rampage.

Defendant contends that the evidence showed he intended only to wound or disable these victims. Again, while such a scenario might be possible, we presume in support of the verdict the existence of every fact that can be reasonably inferred from the evidence.

Given the evidence of defendant's behavior both before and during the carnage, coupled with his choice of lethal ammunition, the annotated book recovered from his car, and the torn-up note expressing his interest in death and killing, a reasonable trier of fact could have concluded that defendant harbored the specific intent to kill these 10 victims and thus could have found him guilty on the attempted murder counts.

### 3. Judicial Misconduct

Defendant contends that the trial court was biased against mental health professionals and the study of psychology in general, thus violating his right to a fair trial. A court commits misconduct if it creates the impression that it is denigrating the defense or otherwise allying itself with the prosecution. (*People v. Blacksher* (2011) 52 Cal.4th 769, 824 (*Blacksher*).)

During defendant's examination of his psychologist, Dr. Rubinstein, the following colloquy occurred:

"[DEFENSE COUNSEL]: You were asked yesterday about the relative number of criminal cases that you had examined or patients that you had examined as opposed to [noncriminal] cases. [¶] Does that — is that significant or is it for your purposes a matter of a brain is a brain is a brain?

"[DR. RUBINSTEIN]: A brain is a brain is a brain. I don't believe a heart surgeon needs to know whether his patient has been accused of a crime or not to perform the procedures that he's been trained to perform.

"THE COURT: Is that Gertrude Rubinstein? I'm sorry. Go ahead with your answer, Doctor."

This exchange was apparently a play on the words of Gertrude Stein's famous line in her poem "Sacred Emily": "Rose is a rose is a rose is a rose." (Stein (1922) Geography and Plays.)

Almost immediately after this exchange, defense counsel asked Dr. Rubinstein, "There is oft times a criticism of psychiatry and psychology that contends that psychology and psychiatry [are] nothing more than Freud and Freud is nothing more than saying people have problems because they hate their mother or their father. [¶] You may have heard different forms. How do you respond to that?"

The prosecutor objected to the question as leading and implied that it was confusing as well. The trial court responded, "Well, I'm going to overrule the objection. It is proper to ask an expert a leading question. And I think it's an understandable question. *It's really all the psychology stuff is mumbo jumbo stuff.*" (Italics added.) During his penalty phase closing argument, the prosecutor belittled the evidence of defendant's state of mind, calling it "mumbo jumbo."

Defendant did not object to either of the trial court's remarks. Ordinarily, the lack of an objection at trial forfeits the claim on appeal. (*Blacksher*, *supra*, 52 Cal.4th at p. 825.) However, a failure to object to judicial misconduct does not preclude appellate review when an objection could not have cured the prejudice or would have been futile. (*People v. Sturm* (2006) 37 Cal.4th 1218, 1237 (*Sturm*).) In *Sturm*, we ruled the defendant had not forfeited his claim of judicial misconduct, despite his lack of objections, because the hostility between the trial court and defense counsel was evident. (*Ibid.*) Moreover, *Sturm* involved numerous, extensive disparaging remarks. (*Id.* at pp. 1233-1236.) Neither of those circumstances is present here. Accordingly, defendant has forfeited this claim because a timely admonition could have cured any potential prejudice.

Even if we considered this claim on the merits, it would fail. "[T]his court has repeatedly stated that a trial court must avoid comments that convey to the jury the message that the judge does not believe the testimony of the witness." (*Sturm*, *supra*, 37 Cal.4th at p. 1238.) The trial court's reference to "Gertrude Rubinstein" did not do so

and was simply an ill-advised attempt to interject some levity into the proceedings, "always a risky venture during a trial for a capital offense." (*Ibid.*)

This remark is unlike those found improper in *People v. Geier* (2007) 41 Cal.4th 555 (*Geier*), overruled on another point by *Melendez-Diaz v. Massachusetts* (2009) 557 U.S. 305. The trial judge in *Geier* facetiously associated one defense witness with Forrest Gump, "a dim-witted fictional character," and made a reference to "Oprah" to suggest that the personal life of another defense witness "was the stuff of tabloid television." (*Geier*, *supra*, 41 Cal.4th at p. 614.) We held that these remarks "could have been perceived by jurors as derogatory comments on the credibility of those witnesses." (*Ibid.*) That is not the case here. The trial court's apparent reference to the poet Gertrude Stein did not denigrate the expert witness.

Neither would the trial court's use of the phrase "mumbo jumbo" in overruling an objection to the prosecutor's question to the expert require us to reverse the judgment. The court did not express the opinion that psychiatry and psychology were "mumbo jumbo." It simply restated a common criticism in colloquial but ill-advised terms in explaining why the question was proper.

The jury heard extensive testimony, offered by both parties, from a total of four mental health professionals. Although defendant contends that the trial court harbored a "scornful" opinion of his case, the remarks in context do not show that the court was no longer an impartial arbiter. Even if improper, these two brief remarks " 'fall short of the intemperate or biased judicial conduct [that] warrants reversal.' " (*Geier*, *supra*, 41 Cal.4th at p. 614.) Accordingly, we also reject defendant's contention that the trial court's remarks prejudiced him during the sanity trial and penalty phase.

### 4. Admission of Lay Opinion

Defendant contends that the trial court erred by allowing Rewerts to testify that if defendant had been molested by Brens, he believed defendant would have told him about

it.  Under section 800 of the Evidence Code, a witness may provide an opinion if it is rationally based on what he or she perceived and if it is helpful to a clear understanding of the testimony.

During the prosecutor's rebuttal case, the following colloquy occurred:

"[PROSECUTOR]:  In your opinion based upon the relationship and the type of relationship you had with [defendant], is that the type of thing, having sexual contact with Mr. Brens, that the defendant would have talked to you about had it occurred?

"[REWERTS]:  Yeah.  We were friends.  I believe that he would have told me such a thing about Mr. Brens touching him or doing anything else.  I believe that he would have told me."

The Attorney General preliminarily contends that defendant has forfeited this claim by failing to object at trial.  (See Evid. Code, § 353, subd. (a).)  Before Rewerts testified, however, defendant requested an offer of proof as to the substance of his proposed testimony.  The prosecutor summarized Rewerts's proposed testimony, and defendant raised various objections, including an objection that the offer of proof indicated that Rewerts intended to speculate about what information defendant would choose to reveal to him.  The trial court permitted Rewerts to testify on this subject, and he did so.  Defendant therefore properly preserved this issue for appeal.

Defendant contends that the trial court improperly allowed Rewerts to testify about defendant's veracity.  Defendant is correct that generally a lay witness may not express an opinion about the veracity of another person's statement because the statement's veracity is for the jury to decide.  (E.g., *People v. Melton* (1988) 44 Cal.3d 713, 744; but see *People v. Chatman* (2006) 38 Cal.4th 344, 379-384.)  However, Rewerts did not provide an opinion about the veracity of any of defendant's statements.  Although Rewerts's belief about what information defendant would have shared with him, coupled with the fact that defendant did not share such information, might have implied that

40

Rewerts thought defendant's molestation allegations were false, he did not actually offer an opinion on this ultimate issue of fact.

Rewerts's testimony that he and defendant often discussed sexual matters was relevant and admissible. The same is true for Rewerts's testimony that defendant never discussed with him the claimed molestation by Brens. It also would have been proper for Rewerts to express his opinion that it would be normal for them to discuss such personal matters, as such testimony would shed light on the nature of their relationship. But in the testimony at issue, Rewerts went a step farther. He did not say it would have been normal for defendant to discuss with him the alleged molestation by Brens. Instead, he specifically testified that defendant "would have told me such a thing." This statement was speculative and not based on anything Rewerts might have perceived through his physical senses, and his opinion on the matter did not help the jury understand the rest of his testimony. (See *Blacksher*, *supra*, 52 Cal.4th at p. 808 [lay witness may testify about objective behavior but may not give an opinion about another's state of mind].) Although it is reasonable to infer that, in light of the nature of their relationship, defendant would have told Rewerts about the alleged molestation by Brens, it is the role of the trier of fact, not the witness, to make such an inference. The trial court should not have permitted Rewerts's specific testimony about what defendant would have told him.

Given the overwhelming evidence of defendant's guilt, however, he is not entitled to relief based on this error under the applicable federal or state standard of review. (*Chapman, supra*, 386 U.S. at p. 24; *Watson*, *supra*, 46 Cal.2d at p. 836.) We similarly reject defendant's contention that this error prejudiced him during the sanity trial and penalty phase.

### 5. Prosecutorial Misconduct During the Guilt Phase

"A prosecutor commits misconduct when his or her conduct either infects the trial with such unfairness as to render the subsequent conviction a denial of due process, or

41

involves deceptive or reprehensible methods employed to persuade the trier of fact." (*People v. Avila* (2009) 46 Cal.4th 680, 711 (*Avila*) [applying both federal and state standards].)

During his guilt phase closing argument, the prosecutor stated, "And if you've noticed throughout this trial, during defense counsel's opening statement and during their argument, the defendant cried. But when we talked about [the victims, there] was no emotion. Because all [defendant] cares about is [defendant]. And [defendant] can do no wrong, because everybody else has screwed it up for him." Defendant contends that the prosecutor committed misconduct during his closing argument by this comment on his demeanor.

As the Attorney General correctly notes, this claim is forfeited because defendant failed to object or request a curative admonition in the trial court. (E.g., *Avila*, *supra*, 46 Cal.4th at pp. 710-711.) Even were we to consider the claim on the merits, we are not persuaded. Defendant is correct that a prosecutor may not comment on a defendant's demeanor or behavior during the guilt phase unless it is to tell the jury to ignore a defendant's demeanor or behavior. (E.g., *People v. Boyette* (2002) 29 Cal.4th 381, 434.) To the extent the prosecutor asked the jury to ignore defendant's crying, there was no misconduct. We agree with defendant, however, that it was misconduct for the prosecutor to ask the jury to note defendant's *lack* of crying, which in this context implied a lack of remorse. But given the overwhelming evidence of defendant's guilt, he is not entitled to relief based on this comment under the applicable federal or state standard of review. (*Chapman, supra*, 386 U.S. at p. 24; *Watson*, *supra*, 46 Cal.2d at p. 836.)

Defendant also contends that the prosecutor's comment improperly highlighted his exercise of his constitutional right to remain silent in the face of criminal charges (*Griffin v. California* (1965) 380 U.S. 609), but nothing in the prosecutor's comment either

42

directly or indirectly implicated the decision not to testify. (E.g., *People v. Combs* (2004) 34 Cal.4th 821, 866-867 (*Combs*).)

### 6. Jury Instruction Regarding Accomplice Testimony

Defendant contends that the trial court erred by failing to instruct the jury to view the testimony of Rewerts, his best friend, with caution because it could have found that Rewerts was an accomplice. Section 1111 provides in pertinent part: "A conviction can not be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense . . . ."

When a jury receives substantial evidence that a witness who has implicated the defendant was an accomplice, a trial court on its own motion must instruct it on the principles regarding accomplice testimony. (*Boyer*, *supra*, 38 Cal.4th at pp. 466-467.) This includes instructing the jury that an accomplice's testimony implicating the defendant must be viewed with caution and corroborated by other evidence. (*Ibid.*; see CALJIC Nos. 3.11, 3.18; CALCRIM Nos. 334, 335.)

Rewerts testified that, a few months before the shootings, he had told defendant about his own desire to "destroy[] things," and defendant responded by saying he wanted to go to the high school and "shoot[] a couple of people." Rewerts initially thought to himself, " 'No, it can't be. If he is, that's stupid.' It's so stupid of him to go through with such a bizarre idea." The pair discussed, two or three times after that initial conversation, going to the school and "shoot[ing] a couple rounds." One scenario involved them "using robots." Rewerts described these conversations as "passé talk," "just idle talk" "between two friends," and "stupid." He explained "[e]verybody says that they're going to go out and in anger that they're going to kill a person, but they don't." Rewerts also testified defendant had read to Rewerts passages from a book on military tactics and police procedures. Rewerts further testified that he and defendant had gone target shooting together.

43

During his interrogation, defendant told law enforcement personnel that Rewerts had not helped him. Defendant also said his initial conversation with Rewerts about this topic was about a dream he had had and not about an actual plan or desire to attack the school.

An accomplice is someone subject to prosecution for the charged crimes by reason of aiding and abetting or being a member of a conspiracy to commit the charged crimes. (§ 1111; e.g., *People v. Slaughter* (2002) 27 Cal.4th 1187, 1201-1202.) " 'An accomplice must have " 'guilty knowledge and intent with regard to the commission of the crime.' " ' " (*Boyer*, *supra*, 38 Cal.4th at p. 467.) In *People v. Beeman* (1984) 35 Cal.3d 547, we explained what is required for aiding and abetting liability. In *Beeman*, the defendant was convicted of robbery and other crimes on an aider and abettor theory of liability. We reversed the defendant's convictions because the jury instructions did not explain that an aider and abettor must act "with knowledge of the criminal purpose of the perpetrator *and* with an intent or purpose either of committing, or of encouraging or facilitating commission of, the offense." (*Id.* at p. 560, italics in original.) In other words, an aider and abettor of a specific intent crime shares the perpetrator's specific intent when he or she knows of the perpetrator's criminal purpose and aids, promotes, encourages, or instigates the perpetrator with the intent of encouraging or facilitating the commission of the crime. (*Ibid.*; see CALJIC No. 3.01; CALCRIM No. 401.)

Moreover, if an accomplice aids, promotes, encourages, or instigates a confederate to commit a crime, but the confederate instead commits another, more serious crime, the accomplice may be liable for the more serious crime if it was a "natural and probable consequence" of the crime that the accomplice intended to aid and abet. (E.g., *People v. Prettyman* (1996) 14 Cal.4th 248, 259-263; see CALJIC No. 3.02; CALCRIM No. 402.) Thus, defendant contends, if Rewerts aided and abetted his "shooting a couple [of] people" or even just "shoot[ing] a couple of rounds" while inside the school, then Rewerts was an aider and abettor to the natural and probable consequences of those

44

crimes, that is, murder, attempted murder, and assault with a deadly weapon. Defendant therefore concludes Rewerts was an accomplice as a matter of law because he knew of defendant's criminal purpose and encouraged him to act, which resulted in defendant attacking the school.

There was no evidence indicating that Rewerts intended to aid, facilitate, or encourage defendant's actions, or that Rewerts even knew what defendant intended to do. Moreover, defendant admitted that Rewerts had not helped him. Although on multiple occasions they discussed going to the school, the record shows that Rewerts thought the two of them were engaging in an idle fantasy, not planning a crime. There was no evidence, let alone substantial evidence, that Rewerts was an accomplice such that the trial court was required to instruct the jury on accomplice liability. Similarly, that the two went shooting together is not dispositive because there was no evidence those excursions were in any way related to defendant's crimes.

Even if we were to agree that substantial evidence showed Rewerts actually was an accomplice and that the trial court erred by failing to properly instruct the jury, the error was harmless under any applicable standard because the corroborating evidence of defendant's guilt, including his state of mind, was overwhelming. (*Boyer*, *supra*, 38 Cal.4th at p. 467.)

### 7. Life Sentences for the 10 Attempted Murder Counts

Defendant contends that he was improperly sentenced to life imprisonment for each count of attempted murder because the indictment failed to allege that the attempted murders were willful, deliberate, and premeditated. At the time of defendant's 1992 indictment, former subdivision 1 (now subdivision (a)) of section 664 stated in pertinent part, "[I]f the crime attempted is willful, deliberate, and premeditated murder, as defined in Section 189, the person guilty of that attempt shall be punishable by imprisonment in the state prison for life with the possibility of parole; provided, further that if the crime

45

attempted is any other one in which the maximum sentence is life imprisonment or death the person guilty of the attempt shall be punishable by imprisonment in the state prison for a term of five, seven, or nine years. The additional term provided in this section for attempted willful, deliberate, and premeditated murder shall not be imposed unless the fact that the attempted murder was willful, deliberate, and premeditated is charged in the accusatory pleading and admitted or found to be true by the trier of fact." (§ 664, subd. 1, as amended by Stats. 1986, ch. 519, § 2, p. 1859.)

The indictment in this case alleged, with respect to each of the 10 attempted murder victims, that defendant violated "Section 664/187 . . . , to wit: did willfully and unlawfully attempt to commit the crime of murder in violation of Section 187 . . . in that he did willfully and unlawfully, and with malice aforethought, attempt to murder [the victim], a human being." It did not allege that the attempted murders were deliberate and premeditated.

At the end of the first day of defendant's presentation of his case, the trial court presented the parties with a preliminary draft of the verdict forms, which indicated that the court would ask the jury to determine whether the attempted murders were willful, deliberate, and premeditated. The trial court stated:

"And the final thing that is not completely clear in the verdict form, because I don't think I had it clear in my mind when I was putting it together, is the distinction between the two kinds of attempted murder, and if I understand what the prosecution is doing in [the attempted murder counts], I believe the prosecution is intending to charge premeditated attempted murder.

"*If that's not right, you should tell me now*, or as soon hereafter as you are able to, because it would help me.

"In other words, the type of attempted murder [that is] punished by life imprisonment rather than five, seven, nine." (Italics added.)

46

One week later, the trial court announced its intent to have the attempted murder verdict form list deliberate and premeditated attempted murder as "a special finding." Then, after the close of evidence, the trial court instructed the jurors on the definition of attempted murder and further instructed them to determine whether the attempted murders were willful, deliberate, and premeditated. Defendant did not object before the court submitted the case to the jury or at sentencing. As noted, the jury found beyond a reasonable doubt that the 10 attempted murders were willful, deliberate, and premeditated.

The Attorney General concedes that the indictment failed to allege that the attempted murders were deliberate and premeditated, but contends defendant has forfeited this claim. We agree.

It is uncontested that the indictment failed to comply with the requirements of section 664. *People v. Bright* (1996) 12 Cal.4th 652 (*Bright*), overruled on another point by *People v. Seel* (2004) 34 Cal.4th 535, however, is instructive. In *Bright*, the jury found the defendant guilty of attempted murder, but was unable to agree on whether the attempted murder was willful, deliberate, and premeditated. (*Bright*, *supra*, 12 Cal.4th at p. 658.) The defendant argued double jeopardy prevented the prosecution from retrying him on the premeditation allegation, reasoning premeditated attempted murder was a greater degree of the offense of attempted murder. (*Id.* at pp. 658-660.) As part of our rationale in rejecting the defendant's claim that premeditated attempted murder was a greater degree of the offense of which he was convicted, we noted the charging document and jury instructions adequately apprised the defendant that he was charged with a single offense, rather than one of degrees. (*Id.* at p. 670.) "Under these circumstances, where defendant failed to object at trial to the adequacy of the notice he received, any such objection is deemed waived." (*Id.* at p. 671.) Due to the high court's subsequent decision in *Apprendi v. New Jersey* (2000) 530 U.S. 466 (*Apprendi*), we have since concluded that the federal double jeopardy clause does bar retrial of a premeditation

47

allegation following a determination that the evidence was insufficient. (*Seel*, *supra*, 34 Cal.4th at p. 550, fn. 6.) But neither *Apprendi* nor *Seel* is helpful to defendant. Those cases did not discuss whether the defendant received adequate notice, but rather whether the facts alleged were established beyond a reasonable doubt. (See *People v. Famalaro* (2011) 52 Cal.4th 1, 37.) In the present case, it was established beyond a reasonable doubt that the attempted murders were deliberate and premeditated.

A defendant has a due process right to fair notice of the allegations that will be invoked to increase the punishment for his or her crimes. (E.g., *People v. Mancebo* (2002) 27 Cal.4th 735, 747 (*Mancebo*).) To the extent defendant contends he was not provided adequate notice of the punishment he faced, we are not persuaded. During the defense's presentation of its case, the trial court expressly noted that defendant, if convicted, would be sentenced to life imprisonment, and the court asked the parties to say if there was a problem with the proposed jury instructions and verdict forms. One week later, the court said the attempted murder verdict form would include deliberate and premeditated attempted murder as a special finding. At the close of evidence, the trial court instructed the jury to determine whether the attempted murders were willful, deliberate, and premeditated, and indicated that a special finding on this question appeared on the verdict form. Had defendant raised a timely objection to the jury instructions and verdict forms at any of these stages of the trial on the ground that the indictment did not allege that the attempted murders were deliberate and premeditated, the court could have heard arguments on whether to permit the prosecutor to amend the indictment. (See § 1009 [trial court may permit amendment of an indictment at any stage of the proceedings].) If the trial court was inclined to permit amendment, defendant could have requested a continuance to permit him to prepare a defense. (See *Murtishaw*, *supra*, 29 Cal.3d at p. 751, fn. 11.) On the facts here, defendant received adequate notice of the sentence he faced, and the jury made an express finding that the attempted murders were willful, deliberate, and premeditated. A timely objection to the adequacy of the

indictment would have provided an opportunity to craft an appropriate remedy. Because defendant had notice of the sentence he faced and did not raise an objection in the trial court, he has forfeited this claim on appeal. (See *People v. Memro* (1995) 11 Cal.4th 786, 869 [claim of inadequate notice of intent to seek a felony-murder conviction forfeited on appeal because the defendant failed to move to reopen after prosecutor requested the applicable jury instruction on this particular theory of murder].)

Defendant's case is similar to *People v. Arias* (2010) 182 Cal.App.4th 1009, which in turn relied upon our decision in *Mancebo*. In *Arias,* the defendant was convicted of two counts of attempted murder but the charging document failed to allege that the attempted murders were willful, deliberate, and premeditated. (*Id.* at p. 1017.) The trial court proposed a set of jury instructions and verdict forms to which neither party objected. (*Id.* at p. 1017, fn. 4.) The trial court instructed the jury that if it found the defendant guilty of attempted murder, then it must make a separate finding whether the attempted murder was done willfully and with premeditation and deliberation. (*Id.* at p. 1017.) The verdicts did not include any special findings with regard to premeditation and deliberation, but rather found "first degree attempted murder" as to both victims, even though attempted murder is not divided into degrees (*Bright*, *supra*, 12 Cal.4th at p. 668). On that basis, the trial court imposed life imprisonment for the convictions. (*Arias*, *supra*, 182 Cal.App.4th at p. 1017.) The Court of Appeal struck the sentences, rejecting the Attorney General's argument that the defendant had forfeited his claim that the indictment was inadequate and reasoning that this court had "rejected this same argument in materially indistinguishable circumstances" in our decision in *Mancebo*. (*Arias*, *supra*, 182 Cal.App.4th at p. 1017.)

In *Mancebo*, the jury had found that the defendant personally used a firearm in the commission of the offense, but the prosecution was forced to choose between using that fact to impose an enhancement under section 12022.5, subdivision (a), or a life term under the One Strike Law (§ 667.61, former subd. (e)(4)). (*Mancebo*, *supra*, 27 Cal.4th

at pp. 742-743.)  Although the prosecution had intended to rely on the defendant's gun use to impose an enhancement under the One Strike Law, for the first time at sentencing the prosecutor sought to dismiss the gun-use allegation under the One Strike Law and substitute a multiple-victim circumstance (§ 667.61, former subd. (e)(5)) so that both the determinate-term enhancement and the life term could be imposed.  We ruled that section 667.61, subdivision (f) "precluded the trial court from striking those circumstances in order to free up gun use as a basis for imposing lesser enhancement terms under section 12022.5(a)" and held that the defendant did not forfeit the claim by failing to object at the sentencing hearing.  (*Mancebo*, *supra*, 27 Cal.4th at pp. 749-750, fn. 7.)

We need not and do not decide whether the *Arias* court erred in ruling that the defendant there did not forfeit his claim that the indictment was inadequate.  The *Arias* jury was instructed that if it found the defendant guilty of attempted murder, it must determine whether the attempted murder was willful, deliberate, and premeditated, and the defendant did not object to that instruction.  But it is unclear when the trial court issued its proposed jury instructions and verdict forms to the parties and whether this issue was discussed.  In contrast, the trial court here actually notified defendant of the possible sentence he faced before his case was submitted to the jury, and defendant had sufficient opportunity to object to the indictment and request additional time to formulate a defense.  In addition, the jury was properly instructed and made an express finding that the attempted murders were willful, deliberate, and premeditated.  On these facts, we conclude that defendant forfeited his claim that the indictment did not comply with section 664.

C. Sanity Trial Claim: Assertedly Incorrect Jury Instructions Defining Insanity

Defendant contends that the trial court improperly instructed the jury on the definition of insanity. When considering a claim of instructional error, we view the challenged instruction in the context of the instructions as a whole and the trial record to determine whether there is a reasonable likelihood the jury applied the instruction in an impermissible manner. (E.g., *People v. Jablonski* (2006) 37 Cal.4th 774, 831 (*Jablonski*).)

At the end of the sanity trial, the court instructed the jury with CALJIC No. 4.00 in pertinent part as follows: "A person is legally insane by reason of mental disease or mental defect [if] he was incapable of knowing or understanding the nature and quality of his act or incapable of distinguishing right from wrong at the time of the commission of the crime." Defendant asked the trial court to instruct the jury on the definition of "wrong" and provided a proposed instruction. After a slight modification, the following was read to the jury: "Wrong refers to both legal wrong and moral wrong. Wrong in the sanity phase of a trial means the violation of generally accepted standards of moral obligation. A person who understands that *his act* is against the law but is incapable of distinguishing whether it is morally right or morally wrong is legally insane." (Italics added.)

Defendant first contends that these instructions impermissibly required him to prove that at the time of the crimes he could not *generally* distinguish between right and wrong. Defendant correctly notes that the *M'Naghten* test's definition of insanity (*M'Naghten's Case* (1843) 10 Clark & Fin. 200, 210 [8 Eng. Rep. 718, 722]), from which CALJIC No. 4.00 is derived, requires the defendant to be incapable of distinguishing right from wrong *in relation to the crimes*. (E.g., *Jablonski*, *supra*, 37 Cal.4th at p. 831.) Because of this claimed variance between the *M'Naghten* test and CALJIC No. 4.00, defendant contends that it would have been possible for the jury to believe he did not know his

51

actual shooting of people was wrong but nonetheless had the general ability to distinguish right from wrong and to conclude, on that basis, that he was legally sane.

We rejected a nearly identical claim in *Jablonski*. There we noted that the jury received, in addition to CALJIC No. 4.00, the instruction that if " '*during the commission of the crime* the defendant was incapable of understanding that his act was morally wrong or was incapable of understanding that his act was unlawful, then he is not criminally liable.' " (*Jablonski*, *supra*, 37 Cal.4th at p. 831, italics in original.) Although we disagreed with the defendant's claim that CALJIC No. 4.00 was ambiguous, we concluded that any assumed ambiguity was clarified by the additional instruction because it explained to the jury that it was to focus on the defendant's capacity to distinguish right from wrong at the time of the commission of the crimes. (*Jablonski*, *supra*, 37 Cal.4th at p. 832.)

Defendant contends that *Jablonski* did not resolve the problem with CALJIC No. 4.00 because the instructions as a whole still failed to focus the jury's attention on the *nature* of the incapacity. Even were we to agree with defendant that CALJIC No. 4.00 is ambiguous or incomplete, the instructions as a whole adequately explained to the jury that it was to decide whether he had the capacity to distinguish right from wrong in relation to his criminal conduct. The additional instruction given here, like the additional instruction given in *Jablonski*, eliminates any reasonable likelihood that the jury was told to focus on defendant's ability to generally distinguish between right and wrong as opposed to his ability to discern whether "his act" at the time of the commission of the crimes was right or wrong.

Defendant also contends that CALJIC No. 4.00's use of the phrase "by reason of mental disease or mental defect" precluded the jury from finding him insane due to a *combination* of mental diseases and mental defects. We rejected this contention in *People v. Kelly* (1992) 1 Cal.4th 495, 535-536, and see no reason to revisit that conclusion here.

52

D. Penalty Phase Claim: Prosecutorial Misconduct in Argument

Defendant contends that the prosecutor improperly referred to his lack of remorse. " 'A prosecutor may properly comment on a defendant's lack of remorse, as relevant to the question of whether remorse is present as a mitigating circumstance, so long as the prosecutor does not suggest that lack of remorse is an aggravating factor.' " (*Combs*, *supra*, 34 Cal.4th at p. 866.)

During his penalty phase closing argument, the prosecutor stated, "And [defendant] would like you to have sympathy for him. He didn't show very much sympathy for the people who were in building C on May the 1st, 1992. [¶] As a matter of fact he has shown absolutely no remorse during this entire trial as to what happened to those kids and teachers at Lindhurst High School on May the 1st, 1992. Not even when he took the stand yesterday and was given the opportunity did he show any real remorse. Any real I'm sorry for what I did type attitude."

Later in his argument, the prosecutor stated, "And to this day, [defendant] has not shown any remorse for any one of those individuals who were injured on May the 1st, 1992. He has not shown any emotion about their loss of life. His whole concentration has been on [defendant] and [his] family. [¶] If you remember Edith Houston, when she testified yesterday, stated or was asked if [defendant] had ever talked about the victims, and her answer was he was just sorry for what he did to the family."

As noted, defendant's mother, Edith, testified that he had apologized to her about the problems he had caused for his own family. She did not testify that he had ever expressed remorse about the pain he might have caused to anyone else. When defendant testified during the penalty phase, however, he apologized to the living victims and to families of those who had died.

53

As the Attorney General correctly notes, this claim is forfeited because defendant failed to object or request a curative admonition in the trial court. (E.g., *Avila*, *supra*, 46 Cal.4th at pp. 710-711.) Even were we to consider the claim on the merits, given the circumstances of his crimes, defendant would not be not entitled to relief based on this comment under the applicable federal or state standard of review. (*Chapman, supra*, 386 U.S. at p. 24; *Watson*, *supra*, 46 Cal.2d at p. 836.)

E. Constitutional Challenges to the Death Penalty

Defendant reiterates various constitutional challenges to California's death penalty law that we have previously rejected. Adhering to precedent, we reject defendant's arguments that (1) a broad application of section 190.3, factor (a) is unconstitutional; (2) the jury must make written findings; (3) the jury must achieve unanimity as to the existence of aggravating circumstances; (4) the jury's entire verdict must be premised on findings made beyond a reasonable doubt; (5) the jury must be instructed that the aggravating circumstances must outweigh the mitigating circumstances beyond a reasonable doubt, or alternatively, the court was required to instruct that there is no burden of proof; (6) the jury must be instructed to determine whether death is an appropriate punishment; (7) intercase proportionality review is required; (8) use of terms such as "extreme" or "substantial" impermissibly limit the consideration of mitigation evidence; (9) the trial court was required to instruct the jury that certain statutory factors were relevant only in mitigation; (10) California's sentencing scheme violates the right to equal protection; and (11) California's death penalty violates international law and norms. (*People v. Jones* (2011) 51 Cal.4th 346, 380-381, and cases cited therein.)

Moreover, we have held that the jury may consider evidence of unadjudicated criminal activity under section 190.3, factor (b). (*Lee*, *supra*, 51 Cal.4th at p. 653.) Further, neither *Apprendi*, *supra*, 530 U.S. 466, its progeny, nor *Cunningham v. California* (2007) 549 U.S. 270 render the death penalty statutes invalid. (*People v.*

*Alexander* (2010) 49 Cal.4th 846, 938.)  The death penalty statutes adequately narrow the classes of murderers eligible for the death penalty and do not result in "arbitrary and capricious" or "wanton and freakish" determinations.  (*Ibid.*)  A death sentence that comports with state and federal statutory and constitutional law does not violate the Eighth Amendment to the United States Constitution.  (*Id.* at pp. 938-939.)

In addition, we agree with *Murtishaw v. Woodward* (9th Cir. 2001) 255 F.3d 926, 960-961, that the enactment of article I, section 27 of the California Constitution did not violate the due process, equal protection, or guarantee clauses of the United States Constitution.  (See also *People v. Weaver* (2012) 53 Cal.4th 1056, 1093 [rejecting claim that California's death penalty was unconstitutional because the special circumstances were enacted by voter initiative].)  We decline defendant's invitation to revisit *People v. Frierson* (1979) 25 Cal.3d 142, 186-187, in which the lead opinion of this court reasoned that article I, section 27 was a permissible amendment to the California Constitution. (See *Strauss v. Horton* (2009) 46 Cal.4th 364, 429-430 & fn. 21 ["resolution of the issue is now a firmly settled determination"]; *People v. Jackson* (1980) 28 Cal.3d 264, 315, overruled on another point by *People v. Cromer* (2001) 24 Cal.4th 889, 901, fn. 3.)

Even when these contentions are considered collectively, there is no violation of the state or federal Constitutions.  (*People v. Lucero* (2000) 23 Cal.4th 692, 741.)

### F.  Cumulative Error

Defendant contends that the cumulative effect of the errors during the guilt phase, sanity trial, and penalty phase mandates reversal.  We disagree.  No reasonable possibility exists that the jury would have reached a different result absent any of the acknowledged or asserted errors under the applicable federal or state standard of review.  (*Chapman, supra*, 386 U.S. at p. 24; *People v. Hill* (1998) 17 Cal.4th 800, 844-845, overruled on another point by *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069, fn. 13.)

## III.

For the reasons stated above, we affirm the judgment.

LIU, J.

WE CONCUR:  CANTIL-SAKAUYE, C. J.
KENNARD, J.
BAXTER, J.
WERDEGAR, J.
CHIN, J.
CORRIGAN, J.

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Houston

_____

**Unpublished Opinion**
**Original Appeal** XXX
**Original Proceeding**
**Review Granted**
**Rehearing Granted**


_____

**Opinion No.** S035190
**Date Filed:** August 2, 2012

_____

**Court:** Superior
**County:** Napa
**Judge:** W. Scott Snowden


_____

**Counsel:**

David H. Schwartz, under appointment by the Supreme Court, for Defendant and Appellant.

Edmund G. Brown, Jr., and Kamala D. Harris, Attorneys General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Harry Joseph Colombo and Julie A. Hokans, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

David H. Schwartz
Law Offices of David H. Schwartz
601 California Street, Suite 1800
San Francisco, CA  94108
(415) 399-9301

Julie A. Hokans
Deputy Attorney General
1300 I Street, Suite 125
Sacramento, CA  94244-2550
(916) 324-5292