Filed 4/17/15

**CERTIFIED FOR PARTIAL PUBLICATION**[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE OF THE STATE OF CALIFORNIA, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> SAMNANG SEK, et al., <br><br> Defendants and Appellants. | B251196 <br><br> (Los Angeles County <br> Super. Ct. No. NA087661) |
| In re TERRY MY, <br><br> On Habeas Corpus. | B254949 <br> (Los Angeles County <br> Super. Ct. No. NA087661) |
| In re SAMNANG SEK, <br><br> On Habeas Corpus. | B254954 <br> (Los Angeles County <br> Super. Ct. No. NA087661) |

        APPEAL from a judgment of the Superior Court of Los Angeles County. Gary J. Ferrari, Judge. Affirmed in part, reversed in part. Petitions for habeas corpus denied.

        Joshua L. Siegel, under appointment by the Court of Appeal, for Defendant, Appellant and Petitioner Samnang Sek.

        Allison H. Ting, under appointment by the Court of Appeal, for Defendant, Appellant and Petitioner Terry My.

---

[*]        Pursuant to California Rules of Court, rules 8.1100 and 8.1110, this opinion is certified for publication with the exception of parts II and III of the Discussion.

Kamala D. Harris, Attorney General, Lance E. Winters, Assistant Attorney General, Margaret E. Maxwell and Eric E. Reynolds, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Samnang Sek and Terry My were convicted by a jury of two counts of attempted murder (counts 1 and 5) and related crimes.  We affirm in part and reverse in part.  In the published portion of our opinion, we hold that (1) the trial court prejudicially erred by giving the jury CALJIC No. 8.66.1, a legally erroneous and misleading instruction on the "kill zone" theory of liability for attempted murder, and (2) the trial court erred by imposing indeterminate life sentences for the attempted murder convictions when the information did not allege that the attempted murders were willful, deliberate, and premeditated.  In the unpublished portion of our opinion, we reject defendants' remaining arguments.[1]

## FACTS AND PROCEEDINGS BELOW

Late one night Saul Mejia parked on a street in Long Beach while his girlfriend, Inez Perez, walked her daughter across the street to her mother's apartment.  A white car pulled up alongside Mejia, and the passenger, later identified as defendant My, motioned to Mejia to roll down his window.  When Mejia did so, My asked him:  "Where are you from?"  Mejia interpreted this as asking him what gang he belonged to.  He was surprised to be approached in this manner and only answered:  "What?  Huh?"  My leaned out of the car window and announced:  "Asian Boys.  Fuck you.  Fuck you."  Mejia looked at Perez across the street and told her to go inside.  When he looked back My was pointing a gun at him.

---

[1]      On appeal and the accompanying habeas corpus petitions, all of the issues raised by defendants relate only to counts 1 and 5.  We therefore affirm the convictions on the remaining counts.  But because the sentences on those counts might be affected by the proceedings on remand concerning counts 1 and 5, we vacate defendants' sentences in their entirety and remand for resentencing on all counts.

2

Mejia sped off down the street. After he passed seven or ten houses, he stopped to see if the white car was following him or if My and the driver were harassing Perez. He could not see anyone bothering Perez, and the car was still down the street. Mejia called 911 to report what had just happened. While he was talking to the 911 operator, the white car stopped near the rear of Mejia's car. My got out of the car and started running toward Mejia. My had something in his hand, but Mejia couldn't tell what it was. Mejia drove away, circled around the block, and came back to pick up Perez. When Perez left her mother's home and came out to the street, she could see the white car parked at the end of the block. She ran to Mejia's car and got in, and Mejia quickly drove away.

Before Mejia and Perez had gone far, they saw the white car approaching them from behind. The car accelerated toward Mejia's car as if it were going to try to come alongside it. Mejia swerved to the left and to the right to prevent the white car from coming alongside. Mejia made a right turn. As he did so, My fired six or seven shots toward the passenger side of Mejia's car. Three of the bullets struck the car: One hit the front passenger side fender, one struck the rear passenger door, and one hit the car's rear bumper.

A jury found My and the white car's driver, Sek, guilty of numerous felonies arising out of this incident, including attempted murder of Mejia (count 1) and attempted murder of Perez (count 5). Although the information did not allege that the attempted murders were willful, deliberate, and premeditated, the court instructed the jury on that issue, and the jury found as to both defendants and both counts that the attempted murders were willful, deliberate, and premeditated. On the attempted murder counts, My was sentenced to consecutive terms of 35 years to life including enhancements, and Sek was sentenced to consecutive terms of 27 years to life including enhancements. Each defendant filed a timely appeal and a petition for habeas corpus.

3

DISCUSSION

I. THE COURT PREJUDICIALLY ERRED BY GIVING THE CALJIC "KILL ZONE" INSTRUCTION.

Defendants argue that the trial court erred by instructing the jury with CALJIC No. 8.66.1 concerning the kill zone theory of liability for attempted murder, and that the error was prejudicial. We agree.[2]

A. Instructional Error

In *People v. McCloud* (2012) 211 Cal.App.4th 788, 796-803 (*McCloud*), we discussed the kill zone theory in detail. The following is a brief summary: "Attempted murder requires the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing." (*People v. Lee* (2003) 31 Cal.4th 613, 623; see *McCloud*, *supra*, 211 Cal.App.4th at p. 796.) Also, although the doctrine of transferred intent can serve as the basis for a murder conviction, "intent to kill does not transfer to victims who are not killed, and thus 'transferred intent' cannot serve as a basis for a finding of attempted murder." (*People v. Perez* (2010) 50 Cal.4th 222, 232; see *McCloud*, *supra*, 211 Cal.App.4th at p. 797.) Nonetheless, if an attacker is attempting to kill a targeted victim and uses "lethal force designed and intended to kill everyone in an area around the targeted victim (i.e., the 'kill zone') as the means of accomplishing the killing of that victim" (*People v. Smith* (2005) 37 Cal.4th 733, 745-746), then the attacker intends to kill each person in that area and hence is guilty of the attempted murder of any who survive the attack. (*McCloud*, *supra*, 211 Cal.App.4th at p. 797.) Placing a bomb on a commercial airplane in order to blow up the plane as a means of killing a specific passenger is a paradigmatic example. (See *People v. Bland* (2002) 28 Cal.4th 313, 329-330.)

As we emphasized in *McCloud*, "[t]he kill zone theory thus does *not* apply if the evidence shows only that the defendant intended to kill a particular targeted individual

---

**2** Respondent contends that defendants forfeited this claim of error by failing to object in the trial court. We disagree, because the issue affects defendants' substantial rights. (See *People v. Ramos* (2008) 163 Cal.App.4th 1082, 1087.)

4

but attacked that individual in a manner that subjected other nearby individuals to a risk of fatal injury.  Nor does the kill zone theory apply if the evidence merely shows, in addition, that the defendant was aware of the lethal risk to the nontargeted individuals and did not care whether they were killed in the course of the attack on the targeted individual.  Rather, the kill zone theory applies only if the evidence shows that the defendant tried to kill the targeted individual *by killing everyone in the area in which the targeted individual was located*.  The defendant in a kill zone case chooses to kill *everyone* in a particular area as a means of killing a targeted individual within that area.  In effect, the defendant reasons that he cannot miss his intended target if he kills *everyone* in the area in which the target is located.

"The kill zone theory consequently does not operate as an exception to the mental state requirement for attempted murder or as a means of somehow bypassing that requirement.  In a kill zone case, the defendant does not merely subject everyone in the kill zone to lethal risk.  Rather, the defendant *specifically intends* that *everyone* in the kill zone die.  If some of those individuals manage to survive the attack, then the defendant— having specifically intended to kill every single one of them and having committed a direct but ineffectual act toward accomplishing that result—can be convicted of their attempted murder." (*McCloud*, *supra*, 211 Cal.App.4th at p. 798.)

*McCloud* also discussed CALJIC No. 8.66.1, which states:  "A person who primarily intends to kill one person, may also concurrently intend to kill other persons within a particular zone of risk.  [This zone of risk is termed the 'kill zone.']  The intent is concurrent when the nature and scope of the attack, while directed at a primary victim, are such that it is reasonable to infer the perpetrator intended to kill the primary victim by killing everyone in that victim's vicinity.  [¶]  Whether a perpetrator actually intended to kill the victim, either as a primary target or as someone within a ['kill zone'] [zone of risk] is an issue to be decided by you."  *McCloud* noted that "[t]he instruction's repeated references to a 'zone of risk' are misleading and have no basis in the law," and that the instruction incorrectly "suggests to the jury that a defendant can create a kill zone merely

5

by subjecting individuals other than the primary target to a risk of fatal injury."
(*McCloud*, *supra*, 211 Cal.App.4th at p. 802, fn. 7.) We accordingly stated that "the instruction should probably be revised." (*Ibid.*) And we also observed that "the Supreme Court has repeatedly explained that jury instructions on the kill zone theory are *never* required." (*Id.* at p. 802.)[3]

In the instant case, which was tried before *McCloud* was decided, the trial court on its own motion elected to instruct the jury on the kill zone theory and used CALJIC No. 8.66.1 (which has not been revised since *McCloud*). The court used all of the bracketed phrases and did not modify the instruction.[4]

The court erred by giving that instruction. As noted in *McCloud*, the repeated references to a "zone of risk" in CALJIC No. 8.66.1 are misleading and have no basis in the law. (*McCloud*, *supra*, 211 Cal.App.4th at p. 802, fn. 7.) In addition, the instruction suffers from other defects that are likely to mislead or confuse the jury or lend support to legally erroneous arguments by the prosecution, as happened in this case.

First, the instruction uses the term "kill zone" but does not adequately define it. The instruction purports to define "kill zone" as follows: "This zone of risk is termed the

---

[3] The Attorney General did not petition the Supreme Court for review in *McCloud*. The defendants did, but the Court denied their petitions.

[4] We note that the court's use of *all* of the bracketed phrases appears to violate the use note for the instruction, which states the following: "'Kill zone' and 'zone of risk' have been bracketed in the last line of the instruction, to coincide with the third bracketed sentence of the instruction. The court should decide what language to use, by choosing whether to employ the phrase, 'kill zone.'" (Use Note to CALJIC No. 8.66.1.) The use note's reference to "the third bracketed sentence of the instruction" seems to be a clerical error, because the instruction contains only one bracketed sentence, and it is the second sentence, not the third. In any event, the use note apparently means that if the court uses the bracketed sentence, which introduces the term "kill zone," then in the final sentence the court should use the term "kill zone" and omit the term "zone of risk." If, however, the court omits the bracketed sentence, then in the final sentence the court should use the term "zone of risk" and omit the term "kill zone." The trial court in the instant case used the bracketed sentence but then also used *both* bracketed phrases (rather than just one, pursuant to the use note) in the final sentence, telling the jury it was to decide whether the perpetrator intended to kill the victim "as someone within a 'kill zone' zone of risk."

'kill zone.'" (CALJIC No. 8.66.1.) That definition is informative only if the instruction elsewhere supplies a sufficiently precise meaning for the phrase "[t]his zone of risk"—if the jury wants to know "What zone of risk is the kill zone?", the instruction should provide the answer. But it does not. Rather, the phrase "[t]his zone of risk" in the definition of the term "kill zone" refers back to the first sentence of the instruction, which states: "A person who primarily intends to kill one person, may also concurrently intend to kill other persons within a particular zone of risk." (CALJIC No. 8.66.1.) So the only information given to the jury concerning "[t]his zone of risk," which is the "kill zone," is that it is "a particular zone of risk," which contains people whom the defendant "may also concurrently intend to kill." (CALJIC No. 8.66.1.) What zone is that? Where is it, and how far does it extend? How can the jury determine who is in it and who is not? The jury will search in vain through CALJIC No. 8.66.1 for answers to those questions. All that the instruction tells them is that the kill zone is a zone of risk (risk of what? physical injury? death? and does it matter whether the defendant created the risk?) that may or may not contain people whom the defendant intends to kill. Any crime scene contains an indefinite number of spatial regions ("zones") that fit that definition but that are not kill zones, as that term has been defined by the Supreme Court.

Second, although attempted murder is a specific intent crime, and although the kill zone theory relates exclusively to the mental state requirement for attempted murder, CALJIC No. 8.66.1 does not contain a single reference to specific intent. The following are all of the instruction's references to intent (including all modifiers): "primarily intends," "concurrently intend," "intent is concurrent," "intended," "actually intended." (CALJIC No. 8.66.1.) Moreover, the instruction is entitled "Attempted Murder—Concurrent Intent" (CALJIC No. 8.66.1), so a reasonable jury would infer that the instruction concerns the intent requirement for attempted murder.[5] But because the instruction expressly refers to "concurrent intent" and never mentions "specific intent," a

---

[5] The written instruction, bearing the title "Attempted Murder—Concurrent Intent," was given to the jury in this case.

jury could reasonably infer that the instruction is introducing a different concept of intent—"concurrent intent"—that can be used as a substitute for the specific intent that would otherwise be required under the attempted murder instruction. In this way, reasonable jurors could conclude that CALJIC No. 8.66.1 authorizes them to convict on an attempted murder charge without a finding of specific intent. Again, CALJIC No. 8.66.1 does not contain a single explicit reference to specific intent.

Third, the instruction's main substantive sentence suffers from an even more severe defect. The sentence provides as follows: "The intent is concurrent when the nature and scope of the attack, while directed at a primary victim, are such that it is reasonable to infer the perpetrator intended to kill the primary victim by killing everyone in that victim's vicinity." (CALJIC No. 8.66.1.) The instruction thus tells the jury that "[t]he intent is concurrent" as long as "it is reasonable to infer" that the perpetrator intended to kill everyone around the primary victim, *regardless of whether the jury actually draws that reasonable inference*. That is, as long as the jury determines that the inference would be reasonable, the instruction appears to mandate a factual finding of "concurrent intent," even if the jury does not actually draw that reasonable inference but instead draws some other reasonable inference. That is patently incorrect. The authors of CALJIC No. 8.66.1 presumably meant something like the following; "*It is reasonable to infer that* the intent is concurrent if the nature and scope of the attack, while directed at a primary victim, are such that it is reasonable to infer the perpetrator intended to kill the primary victim by killing everyone in that victim's vicinity." But that is not what the instruction says.[6] Alternatively, the sentence in question would be considerably

---

[6]    We recognize that the sentence in question is largely based on the following sentence quoted in *Bland*: "'The intent is concurrent . . . when the nature and scope of the attack, while directed at a primary victim, are such that we can conclude the perpetrator intended to ensure harm to the primary victim by harming everyone in that victim's vicinity.'" (*Bland*, *supra*, 28 Cal.4th at p. 329, quoting *Ford v. State* (1992) 330 Md. 682 [625 A.2d 984, 1000-1001].) Any lawyer or judge reading that passage of *Bland* would understand that it means that *it is reasonable to infer* that the intent is concurrent if it is reasonable to infer that the perpetrator intended to ensure harm to the

8

improved if the entire middle section were deleted, leaving only the following: "The intent is concurrent when the perpetrator intended to kill the primary victim by killing everyone in that victim's vicinity." But even then the sentence would still be flawed, because it would still fail to tie the concept of "concurrent intent" to the *specific* intent that is required for attempted murder.

In sum, CALJIC No. 8.66.1 tells the jury that there is a location somewhere called a "kill zone," which has something to do with some kind of risk, and which also has something to do with something called "concurrent intent," which is a mental state that exists as long as a particular inference is reasonable, and which also has something to do with attempted murder. But the instruction does not adequately (1) explicate those concepts, (2) relate them to each other, or (3) relate them to the specific intent requirement for attempted murder, which is ostensibly the instruction's sole purpose.

The instruction's problems appear to derive, at least in part, from its focus on the terminology of "concurrent intent," which the Supreme Court used in *Bland*. (See *Bland*, *supra*, 28 Cal.4th at pp. 329-330.) The thinking behind the instruction seems to be that, although attempted murder requires *specific* intent rather than *general* intent, and *transferred* intent does not apply, there is another kind of intent, namely, *concurrent* intent, which will serve as an adequate substitute for specific intent in appropriate circumstances.

Such reasoning is erroneous and represents a misunderstanding of *Bland*. *Bland* did not approve any deviation from the specific intent requirement for attempted murder under any circumstances. Nor did *Bland* use the word "concurrent" as a legal term of art. "Concurrent" means "happening at the same time" or "operating or

---

primary victim by harming everyone in that victim's vicinity. To a lawyer or judge, the passage obviously does not mean that the intent is in fact concurrent *as long as it is merely possible to conclude that the perpetrator harbored that intent*. But lay jurors cannot be presumed to overlook the plain language of CALJIC No. 8.66.1 and interpret the instruction as meaning something other than what it literally says. On the contrary, jurors are presumed to follow the instructions they are given. (*People v. Yeoman* (2003) 31 Cal.4th 93, 139.)

occurring at the same time." (Merriam-Webster Online Dict. <http://www.merriam-webster.com/dictionary/concurrent> [as of Feb. 10, 2015].) Where the Supreme Court in *Bland* used the words "concurrent" or "concurrently," it could just as well have used "simultaneous" or "simultaneously" or "at the same time." For example, *Bland* explained that the fact that a "person desires to kill a particular target does not preclude finding that the person also, concurrently, intended to kill others." (*Bland*, *supra*, 28 Cal.4th at p. 329.) In that statement, the word "concurrently" could be replaced by "simultaneously" (or just deleted; the word "also" is already doing the necessary work) without any material change of meaning. In short, *Bland*'s discussion and endorsement of the kill zone theory did not introduce a novel, technical legal concept of "concurrent intent." It merely recognized that it is possible to have two or more intentions at once. Consequently, CALJIC No. 8.66.1 would be a sound and comprehensive statement of the kill zone theory if it were revised to read, in its entirety, "A person who specifically intends to kill a primary target may also specifically intend to kill persons other than the primary target." At the same time, it bears repeating that no instruction on the kill zone theory is *ever* necessary.[7] (*People v. Stone* (2009) 46 Cal.4th 131, 137-138; *Smith*, *supra*, 37 Cal.4th at p. 746; *Bland*, *supra*, 28 Cal.4th at p. 331, fn. 6; *McCloud*, *supra*, 211 Cal.App.4th at p. 802.)

Respondent correctly points out that in reviewing a claim of instructional error, we do not evaluate the challenged instruction in isolation but rather must examine the claim "based on a review of the instructions as a whole in light of the entire record." (*People v. Lucas* (2014) 60 Cal.4th 153, 282.) Respondent further observes that the jury was instructed to "[c]onsider the instructions as a whole and each in light of all the

---

[7] The superfluity of the kill zone instruction is evident if one considers paradigmatic examples of kill zone cases, such as putting a bomb on an airplane when only one person on board is the primary target. (See *Bland*, *supra*, 28 Cal.4th at pp. 329-330.) In such a case, a prosecutor unaided by the terms "kill zone," "concurrent intent," and the like will still have no difficulty arguing that the defendant specifically intended to kill every single person on the plane by blowing it up, even though killing all of those people was just a means to kill a particular individual on the plane.

others," and that the jury was correctly instructed on the specific intent requirement for attempted murder. Respondent concludes that the trial court did not err by giving CALJIC No. 8.66.1 because "reasonable jurors would not interpret CALJIC No. 8.66.1 as allowing them to convict appellants for the attempted murder of Perez without a finding of the requisite specific intent element."

We are not persuaded. As we have explained, errors and confusing or misleading language pervade CALJIC No. 8.66.1. Nothing in the other instructions cures those errors or dispels those confusions. A reasonable jury would not know what to do with the confusing and misleading "zone of risk" language of CALJIC No. 8.66.1. The instruction does not come close to providing the jury with adequate information to determine whether a kill zone exists and, if so, who is in it and who is not. The instruction mandates a finding of "concurrent intent" on a basis that is legally unsound. And no reasonable jury would know how to harmonize CALJIC No. 8.66.1's statements about "concurrent intent" with the specific intent requirement stated in the attempted murder instruction (CALJIC No. 8.66), because CALJIC No. 8.66.1 says nothing about specific intent.

For all of the foregoing reasons, we conclude that the trial court erred by giving the jury CALJIC No. 8.66.1.

### B. Prejudice

The remaining question is whether the instructional error was prejudicial. "Instructional error regarding the elements of the offense requires reversal of the judgment unless the reviewing court concludes beyond a reasonable doubt that the error did not contribute to the verdict." (*People v. Chun* (2009) 45 Cal.4th 1172, 1201.) Defendants argue that because we cannot conclude beyond a reasonable doubt that the erroneous kill zone instruction did not contribute to the verdicts on the attempted murder counts as to victim Perez, we must reverse those convictions. We agree.

In *McCloud*, we applied "the standard articulated in *People v. Watson* (1956) 46 Cal.2d 818, 836-837" to determine whether the instructional error was harmless

11

(*McCloud*, *supra*, 211 Cal.App.4th at p. 803), rather than the harmless-beyond-a-reasonable-doubt standard that we apply here.  The reason for the different treatment is that the error raised in *McCloud* was the giving of a kill zone instruction when there was no substantial evidence to support a kill zone theory.  (See *McCloud*, *supra*, 211 Cal.App.4th at p. 802 ["For all of the foregoing reasons, we conclude that the trial court erred by instructing the jury on the kill zone theory.  The record does not contain substantial evidence to support application of the theory in this case."].)  The defendants in *McCloud* did not argue that the instruction itself was legally erroneous.  Here, in contrast, we express no opinion on whether there was substantial evidence to support a kill zone theory.  Rather, we hold that the kill zone instruction was legally erroneous.  Because it is an instruction regarding the intent element of the offense of attempted murder, we must reverse unless we conclude beyond a reasonable doubt that the error did not contribute to the verdicts.  (*Chun*, *supra*, 45 Cal.4th at p. 1201.)

Given the number and seriousness of the defects that infect CALJIC No. 8.66.1, it might be tempting to infer that the instruction is unavoidably prejudicial in every case in which it is used.  In our view, however, that inference would be invalid, and we reject it.  For example, in a case in which the kill zone theory is not the only theory of attempted murder liability advanced by the prosecution, or in which the evidence of guilt on the attempted murder charges is overwhelming, or both, it might be possible to conclude beyond a reasonable doubt that the giving of CALJIC No. 8.66.1 did not contribute to the attempted murder verdicts.  Consequently, the prejudicial effect of CALJIC No. 8.66.1 must be evaluated case by case.

Here, the prosecution's sole theory of liability on the attempted murder charges concerning Perez was the kill zone theory.  The prosecutor argued as follows:  "Now, by the time Miss Perez gets in the car, they may not have the specific intent to target her, she's not the primary target at this point but there is this theory—this idea of concurrent intent.  Concurrent intent, the defendant—the defendant may primarily intend to kill one person and also concurrently intend to kill other persons within a kill zone.  The intent is

12

concurrent when it is reasonable to infer from the nature and scope of the attack that the defendant intended to kill the primary victim by killing everybody within the victim's vicinity. Right. So they are targeting Mr. Mejia. Miss Perez just happens to be in the line of fire. They are, like, 'Well, I'm going to get Mr. Mejia even if I have to go through Miss Perez. She is in the line of fire.' That makes it so she is in the kill zone. [¶] Imagine, if you will, if I wanted to kill somebody who was on a bus and I decided, 'I'm going to blow up that whole bus and everybody that's on it.' Right. Everybody in that bus is in the kill zone. Everybody in the line of fire in this case is in the kill zone and that's Miss Perez. [¶] Now, Mr. Mejia may have been the primary target but Mr. My is clearly thinking, 'Well, I'm going to get to Mr. Mejia even if I have to go through Miss Perez.' That's the kill zone and that means it is reasonable to infer based on that from the nature of the attack and scope of the attack that the defendant intended to kill everybody within that line of fire."

The prosecutor's argument was based on the defective features of CALJIC No. 8.66.1. The prosecutor's sole reference to specific intent was the statement that when "Perez gets in the car, they may not have the specific intent to target her." Thereafter, the prosecutor argued for attempted murder liability entirely on the basis of "this idea of concurrent intent" without ever linking it to the specific intent requirement. The prosecutor also erroneously argued, in keeping with CALJIC No. 8.66.1, that "[t]he intent is concurrent when it is reasonable to infer from the nature and scope of the attack that the defendant intended to kill the primary victim by killing everybody with the victim's vicinity," thus telling the jury that they must find concurrent intent if they determine that the inference is reasonable.

Even putting all of those issues aside, consideration of the merits shows that it is impossible to conclude that the kill zone instruction did not contribute to the attempted murder verdicts as to victim Perez. The evidence firmly established that Perez was sitting in the passenger seat of Mejia's car when defendants fired multiple shots at the car from the passenger side, so there was no significant dispute as to the *actus reus* of

13

attempted murder as to victim Perez. Consequently, the pivotal factual question on those attempted murder charges concerned only the intent element: Did defendants specifically intend to kill Perez? Or rather did they, in their attempt to kill Mejia, knowingly subject Perez to a risk of fatal injury and not care whether she lived or died? If the former, then they are guilty of the attempted murder of Perez. If the latter, then they are guilty of a serious crime against Perez, but it is not attempted murder.

The heart of the prosecutor's argument was his assertion that defendants were thinking, "'Well, I'm going to get Mr. Mejia even if I have to go through Miss Perez.'" That characterization of defendants' state of mind is at best ambiguous. It could conceivably mean that defendants specifically intended to kill Perez because they specifically intended to shoot Mejia *through* Perez, killing both. But that is far from the most natural or obvious interpretation. The far more likely interpretation of the prosecution's statement is that defendants specifically intended to kill Mejia, knew that by trying to shoot him they were putting Perez in mortal danger, and did not care whether Perez lived or died. If that was defendants' mental state, then they were not guilty of the attempted murder of Perez. That is, the most natural interpretation of the prosecutor's own argument would actually mean, on a proper understanding of the law, that defendants were innocent of the attempted murder of Perez. CALJIC No. 8.66.1 did not, however, equip the jury with a proper understanding of the law. It is therefore likely that the jury interpreted the prosecutor's argument in the natural way but convicted defendants of the attempted murder of Perez anyway, as a result of the confusion generated by CALJIC No. 8.66.1 and the prosecutor's reliance thereon. Indeed, the prosecutor himself surely thought that he was arguing for defendants' guilt, but on a proper understanding of the law and the most natural interpretation of his description of defendants' mental state, his argument actually showed that they were innocent.

For all of the foregoing reasons, under the circumstances of this case we cannot conclude beyond a reasonable doubt that the erroneous kill zone instruction did not

contribute to the attempted murder verdicts as to victim Perez. We therefore must reverse those convictions.[8]

## II. SUBSTANTIAL EVIDENCE SUPPORTS THE ATTEMPTED MURDER CONVICTIONS AS TO VICTIM PEREZ.

Defendants contend their convictions of the attempted murder of Perez must be reversed because there is insufficient evidence that they knew Perez was in the car when they fired on it. Although we have already determined that the convictions for the attempted murder of Perez must be reversed because of instructional error, if the prosecution introduced insufficient evidence to sustain those convictions then they cannot be retried on remand. We conclude, however, that the evidence was sufficient. The evidence permitted the jury to infer that defendants knew Perez was in the passenger seat when they fired six or seven shots into the passenger side of the car.

The evidence showed that when Perez left her mother's house and walked out to the street, she could see defendants' car parked at the end of the block. The jury could reasonably infer that if Perez could see the defendants' car, defendants could see her and so would have seen her getting into Mejia's car. The evidence further showed that My fired six or seven bullets at close range at the passenger side of Mejia's car, where Perez was sitting. The jury could reasonably infer from that evidence that My saw Perez sitting in the passenger seat. Defendants' firing of six or seven bullets at the passenger side of the car, knowing that Perez was sitting there, constitutes substantial evidence of intent to kill Perez.

## III. THE EVIDENCE DID NOT SUPPORT AN INSTRUCTION ON THE LESSER INCLUDED OFFENSE OF ATTEMPTED VOLUNTARY MANSLAUGHTER.

Defendants argue that the court should have instructed the jury on the lesser included offense of attempted voluntary manslaughter based on heat-of-passion and imperfect self-defense. We disagree.

---

[8] Under the circumstances of this case, our conclusion would be the same even if we applied the more deferential standard of *People v. Watson*, *supra*, 46 Cal.2d 818.

The evidence did not support an instruction on attempted voluntary manslaughter based on heat-of-passion. A driver swerving to prevent passing on a residential street is not "sufficiently provocative that it would cause an ordinary person of average disposition to act rashly or without due deliberation and reflection." (*People v. Manriquez* (2005) 37 Cal.4th 547, 583-584.)

The evidence did not support an instruction on attempted voluntary manslaughter based on imperfect self-defense. The self-defense doctrines are not available to a defendant who, through his own wrongful conduct, created the circumstances of his opponent's attack. (*People v. Enraca* (2012) 53 Cal.4th 735, 761.)

IV.     THE LIFE SENTENCES ON THE ATTEMPTED MURDER COUNTS VIOLATED DEFENDANTS' STATUTORY AND DUE PROCESS RIGHTS.

Defendants argue that because the information did not allege that the attempted murders were willful, deliberate, and premeditated, the life sentences imposed as to the attempted murder counts violated their statutory and due process rights. We agree.[9]

A.      Violation of Penal Code Section 664[10] and Due Process

Attempted murder that is not willful, deliberate, and premeditated is punishable by five, seven, or nine years in state prison. (Pen. Code, § 664, subd. (a).) Willful, deliberate, and premeditated attempted murder, in contrast, "shall be punished by imprisonment in the state prison for life with the possibility of parole," but that sentence "shall not be imposed unless the fact that the attempted murder was willful, deliberate, and premeditated is charged in the accusatory pleading and admitted or found to be true by the trier of fact." (*Ibid.*) In addition, "[a] defendant has a due process right to fair notice of the allegations that will be invoked to increase the punishment for his or her crimes." (*People v. Houston* (2012) 54 Cal.4th 1186, 1227 (*Houston*).)

---

[9]     Our reversal of the attempted murder convictions on count 5 (victim Perez) does not render this issue moot, because both defendants also received life sentences for willful, deliberate, and premeditated attempted murder as to count 1 (victim Mejia).

[10]    All subsequent statutory references are to the Penal Code.

16

Neither the original felony complaint, the first amended felony complaint, nor the information alleged that the attempted murders were willful, deliberate, and premeditated. The information was never amended to add such an allegation. Nor was the allegation mentioned at the preliminary hearing, at the start of which the prosecutor stated that he did not anticipate "any changes or additions . . . conforming to proof." The allegation also was not mentioned at defendants' arraignment.

When the last witness at trial testified, the court informed the jurors that the following day the court would instruct them on the law and they would then hear closing arguments from counsel. After the jurors were excused and the court and counsel finished discussing the admission of exhibits, the court and counsel proceeded to discuss jury instructions, but the court first ask defendants if they wished to be present for that discussion. Defendants conferred with counsel, elected not to be present, and then left, so the entire discussion of jury instructions took place in their absence.

During the discussion of jury instructions, the court stated that it planned to give the "willful and deliberate instruction." There was no discussion of the issue beyond that one passing reference, and defense counsel did not object to the instruction. Neither the court nor counsel mentioned the sentencing implications of the allegation that the attempted murders were willful, deliberate, and premeditated. Again, attempted murder that is willful, deliberate, and premeditated is punished by an indeterminate life sentence, but otherwise attempted murder is punishable by a maximum of nine years. (§ 664, subd. (a).)

The verdict forms included the allegation that the attempted murders were willful, deliberate, and premeditated, and the court instructed the jury on that issue. The jury found the allegation true. The court sentenced both defendants to indeterminate life terms on the attempted murder counts. As far as the record discloses, *at no time before the sentencing hearing were defendants themselves ever made aware that they could be sentenced to life in prison on the attempted murder counts on the basis of the unpleaded allegation of willfulness, premeditation, and deliberation*.

17

Defendants' life sentences on the attempted murder counts violate section 664, subdivision (a), because "the fact that the attempted murder was willful, deliberate, and premeditated" was not "charged in the accusatory pleading." Those sentences also violate defendants' due process right "to fair notice of the allegations that will be invoked to increase the punishment for [their] crimes." (*Houston*, *supra*, 54 Cal.4th at p. 1227.) Nothing in the record indicates that before the sentencing hearing defendants themselves had any notice that the attempted murders were alleged to be willful, deliberate, and premeditated and that such an allegation would be invoked to increase the punishment for those crimes to an indeterminate life sentence instead of a maximum of nine years.

### B. Forfeiture

In opposition, respondent argues that "[t]he circumstances in this case are virtually identical to those in *Houston*" and that defendants therefore forfeited this issue by failing to object in the trial court.[11] We disagree.

*Houston* was a school shooting case in which the defendant was convicted on four counts of first degree murder with special circumstances, as well as 10 counts of attempted murder. (*Houston*, *supra*, 54 Cal.4th at pp. 1191-1192.) The indictment "did not allege that the attempted murders were deliberate and premeditated." (*Id.* at p. 1226.) Nonetheless, "[a]t the end of the first day of defendant's presentation of his case, the trial court presented the parties with a preliminary draft of the verdict forms, which indicated that the court would ask the jury to determine whether the attempted murders were willful, deliberate, and premeditated." (*Ibid.*) At that time, the court expressed its understanding that "'the prosecution is intending to charge premeditated attempted murder,'" "'[i]n other words, the type of attempted murder [that is] punished by life imprisonment rather than five, seven, nine.'" (*Ibid.*) One week later, the court "announced its intent to have the attempted murder verdict form list deliberate and premeditated attempted murder as 'a special finding.'" (*Ibid.*) Subsequently, "after the

_____

[11] Respondent's argument does not expressly distinguish between defendants' due process claim and their claim for violation of section 664, subdivision (a).

close of evidence," the court instructed the jurors "to determine whether the attempted murders were willful, deliberate, and premeditated." (*Ibid.*) The defendant did not object either before the court submitted the case to the jury or at sentencing. (*Ibid.*)

Because the trial court (1) expressly informed the defendant on the first day of the defense case that he would be sentenced to life imprisonment on the attempted murder counts if convicted and (2) announced one week later that the attempted murder verdict form would include deliberation and premeditation as a special finding, the Supreme Court concluded on the merits that there was no due process violation because the defendant "received adequate notice of the sentence he faced." (*Houston*, *supra*, 54 Cal.4th at p. 1228.) And because the defendant did not object in the trial court, when "[a] timely objection to the adequacy of the indictment would have provided an opportunity to craft an appropriate remedy," the Court further concluded that the defendant had forfeited his claim for violation of section 664. (*Id.* at pp. 1228-1229 ["defendant forfeited his claim that the indictment did not comply with section 664"].)

*Houston*'s analysis included a discussion of *People v. Arias* (2010) 182 Cal.App.4th 1009, and that discussion is significant for our analysis as well. "In *Arias*, the defendant was convicted of two counts of attempted murder but the charging document failed to allege that the attempted murders were willful, deliberate, and premeditated. (*Id.* at p. 1017.) The trial court proposed a set of jury instructions and verdict forms to which neither party objected. (*Id.* at p. 1017, fn. 4.) The trial court instructed the jury that if it found the defendant guilty of attempted murder, then it must make a separate finding whether the attempted murder was done willfully and with premeditation and deliberation. (*Id.* at p. 1017.) The verdicts did not include any special findings with regard to premeditation and deliberation, but rather found 'first degree attempted murder' as to both victims, even though attempted murder is not divided into degrees [citation]. On that basis, the trial court imposed life imprisonment for the convictions. (*Arias*, *supra*, 182 Cal.App.4th at p. 1017.) The Court of Appeal struck the sentences, rejecting the Attorney General's argument that the defendant had forfeited

19

his claim that the indictment was inadequate . . . . [Citation.]" (*Houston*, *supra*, 54 Cal.4th at p. 1228.) The Court in *Houston* concluded that "[w]e need not and do not decide whether the *Arias* court erred in ruling that the defendant there did not forfeit his claim that the indictment was inadequate," because "it is unclear [in *Arias*] when the trial court issued its proposed jury instructions and verdict forms to the parties and whether this issue was discussed." (*Houston*, *supra*, 54 Cal.4th at p. 1229.)

*Houston*'s treatment of *Arias* has two consequences for our analysis of respondent's forfeiture argument. First, *Houston* shows that failure to object in the trial court on the basis of section 664 does not automatically result in forfeiture of the issue for purposes of appeal. If it did, then *Arias* would be straightforwardly erroneous, but *Houston* expressly declined to so hold. Second, under *Houston* the determination of whether the issue was forfeited will depend upon detailed consideration of the course of proceedings in the trial court, such as "when the trial court issued its proposed jury instructions and verdict forms to the parties" and "whether this issue was discussed." (*Houston*, *supra*, 54 Cal.4th at p. 1229.) In *Houston*, the trial court expressed its intention to instruct on willful, deliberate, and premeditated attempted murder at least one week before the close of evidence, and at the same time the court informed the defendant that the attempted murder counts would consequently be punishable by life in prison. (*Id.* at p. 1226.) For that reason and others, the Court determined that the defendant forfeited the section 664 issue by failing to object. (*Id.* at p. 1229.)

The present case is readily distinguishable from *Houston*. Here, the court did not mention the instruction on willful, deliberate, and premeditated attempted murder until after the close of testimony and after both defendants had left the courtroom. Neither the court nor counsel mentioned the sentencing consequences of the unpleaded allegation that the attempted murders were willful, deliberate, and premeditated. Nothing in the record indicates that defendants themselves were made aware of the sentencing implications of that allegation until the sentencing hearing, when they were sentenced to life imprisonment on the attempted murder counts.

20

For all of the foregoing reasons, we reject respondent's argument that defendants forfeited their due process and section 664 claims by failing to object in the trial court.[12]

C.    Prejudice

The sole remaining issue is prejudice. Because the life sentences on the attempted murder counts violated defendants' due process rights, respondent has the burden of showing that the error was harmless beyond a reasonable doubt. (*People v. Milosavljevic* (2010) 183 Cal.App.4th 640, 647.)

Respondent's brief contains no argument on that issue.[13] Moreover, we see no way that respondent could demonstrate on this record that the error was harmless beyond a reasonable doubt. If defendants had received adequate notice of the allegation that the attempted murders were willful, deliberate, and premeditated, then they could have prepared a defense against that allegation. They might have called other witnesses, testified in their own defense, or altered their cross-examination of prosecution witnesses.

---

[12]    Again, the Court in *Houston* rejected the defendant's due process claim on the merits and further held that the defendant's statutory claim for violation of section 664 was forfeited by failure to object. (*Houston*, *supra*, 54 Cal.4th at pp. 1227-1228 ["defendant received adequate notice of the sentence he faced"]; *id.* at p. 1229 ["defendant forfeited his claim that the indictment did not comply with section 664"].) The Court did not hold that the due process claim was forfeited. But respondent's forfeiture argument in the present case fails to distinguish between the due process claim and the statutory claim. Thus respondent appears to argue on the basis of *Houston* that defendants forfeited both the due process claim and the statutory claim. But because the due process claim in *Houston* was not forfeited, *Houston* would not support respondent's forfeiture argument as to that claim even if the present case were factually indistinguishable from *Houston*, which it is not.

[13]    Respondent argues only that (1) defendants forfeited their due process and statutory claims by failing to object to the error in the trial court, and (2) the failure to object did not constitute ineffective assistance of counsel. On the issue of ineffective assistance, respondent argues that *counsel's failure to object to the error* was not prejudicial, because the court would have amended the information if counsel had objected. But respondent's argument does not address the prejudicial effect of the error itself (namely, the error of sentencing defendants to life imprisonment on the attempted murder counts when the accusatory pleading did not allege that the attempted murders were willful, deliberate, and premeditated).

21

Although respondent would presumably contend that the allegation would have made no difference to the defense, that contention is speculative—there is nothing in this record that proves it beyond a reasonable doubt.

Putting aside trial preparation, another potential source of prejudice is the error's effect on the plea bargaining process. "[I]n many instances a defendant's decision whether to plea bargain or go to trial will turn on the extent of his exposure to a lengthy prison term." (*People v. Mancebo* (2002) 27 Cal.4th 735, 752.) Here, the prosecution made pretrial plea offers, and defendants rejected them. But because the prosecution had not yet alleged that the attempted murders were willful, deliberate, and premeditated, defendants were deprived of complete information about the sentences to which they were exposed on each count. Moreover, the sentencing implications of the allegation that the attempted murders were willful, deliberate, and premeditated were not limited to the difference between a life sentence (with the allegation) and a maximum of nine years (without it). When a defendant receives consecutive determinate sentences, the subordinate terms are ordinarily one-third of the middle term, but consecutive indeterminate sentences are not subject to any such limitation. (See §§ 669, 1170.1, subd. (a).); *People v. Felix* (2000) 22 Cal.4th 651, 653-657.) Similarly, determinate enhancements for subordinate determinate terms are limited to one-third of the enhancement term, but that limitation again does not apply to determinate enhancements for indeterminate terms. (*Felix*, *supra*, 22 Cal.4th at pp. 653-657.) Thus, with the allegation that the attempted murders were willful, deliberate, and premeditated, defendants faced the prospect of consecutive life sentences and consecutive 20-year enhancements for firearm use. Without that allegation, defendants faced a maximum of nine years for attempted murder plus 20 years for firearm use on the principal term, plus one-third of seven years for attempted murder and one-third of 20 years for firearm use on the subordinate term.

Again, respondent would presumably contend that none of this mattered, because both defendants were already exposed to life sentences for shooting at an occupied motor

vehicle (§ 246) with a gang enhancement (§ 186.22, subd. (b)(4)). But again, it is respondent's burden to show that the error was harmless beyond a reasonable doubt. Although it is possible that the allegation that the attempted murders were willful, deliberate, and premeditated would have made no difference to defendants' plea negotiation posture, nothing in this record proves it beyond a reasonable doubt. Defendants had no notice of the allegation before trial, and defendants apparently did not learn of the allegation's consequences until the sentencing hearing, after the jury had already made its findings and been discharged. By then, the prosecution's incentive to negotiate had been eliminated. Indeed, even if defendants had been present when, after the close of testimony, the court announced its intention to submit the allegation to the jury, and even if at that time defendants had been fully informed of the allegation's consequences for sentencing, the prejudicial effect on plea negotiations would have remained, because by then the prosecution had already invested the time and resources necessary to try the case—at that point, the prosecution had little or nothing to gain by negotiating.

For all of these reasons, respondent has not shown that the failure to give defendants fair notice of the allegation and its sentencing implications, in violation of defendants' due process rights, was harmless beyond a reasonable doubt. We accordingly vacate the true findings on the allegation that the attempted murder in count 1 was willful, deliberate, and premeditated.[14]

---

[14] Our resolution of this issue makes it unnecessary for us to address defendants' argument that the prosecutor committed misconduct in his closing argument concerning that allegation.

## DISPOSITION

The convictions of both defendants on count 5 are reversed. The true findings on the allegation that the attempted murder in count 1 was committed willfully, deliberately, and with premeditation are vacated. The sentences of both defendants are vacated. The judgments are otherwise affirmed, and the case is remanded for further proceedings consistent with this opinion. The petitions for habeas corpus are denied.

CERTIFIED FOR PARTIAL PUBLICATION.


                                        ROTHSCHILD, P. J.

We concur:


CHANEY, J.


BENDIX, J.*

_____

*       Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.